# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **FUTUREFUEL CHEMICAL COMPANY,** ) <br> 2800 Gap Road ) <br> Batesville, AR 72501 ) <br> ) <br>           **PLAINTIFF,** ) <br> ) <br> **v.** ) <br> ) <br> **THE PROCTER & GAMBLE COMPANY,** ) <br> One Procter & Gamble Plaza ) <br> Cincinnati, OH 45202 ) <br> ) <br> c/o Statutory Agent: ) <br> CT Corporation System ) <br> 4400 Easton Commons Way, Suite 125 ) <br> Columbus, OH 43219 ) <br> ) <br> and ) <br> ) <br> **PROCTER & GAMBLE INTERNATIONAL OPERATIONS SA SINGAPORE BRANCH,** ) <br> 80 Raffles Place, #32-01 UOB Plaza ) <br> Singapore, Singapore 048624 ) <br> ) <br> and ) <br> ) <br> **PROCTER & GAMBLE MANUFACTURING MEXICO S. de R.L. de C.V.,** ) <br> Loma de las Palmas #18 ) <br> Lomas de Vista Hermosa ) <br> Cuajimalpa de Morelos ) <br> Ciudad de Mexico 05100 ) <br> Mexico ) <br> ) <br>           **DEFENDANTS.** ) | **CASE NO.** <br><br><br><br> **JUDGE** <br><br><br><br> **COMPLAINT FOR DECLARATORY JUDGMENT WITH JURY DEMAND** |

Plaintiff, FutureFuel Chemical Company ("FutureFuel" or "Plaintiff"), by and through its undersigned counsel, for its complaint against Defendants, The Procter & Gamble Company, Procter & Gamble International Operations SA Singapore Branch, and Procter & Gamble Manufacturing Mexico (collectively "P&G" or "Defendants"), states as follows:

## NATURE OF THE ACTION

1. For nearly forty (40) years, FutureFuel has provided P&G with a unique bleach activating material used in powder laundry detergents, known as Nonanoyloxy Benzene Sulfonate ("NOBS"). P&G is essentially the only customer of this product. Through its use of NOBS provided by FutureFuel, P&G became the market leader in the U.S. powder laundry detergent market. Despite their long relationship and contractual agreement, P&G now seeks to leave FutureFuel holding over a million dollars' worth of raw materials in direct violation of the parties' agreement. Indeed, manufacturing NOBS involves an incredibly expansive and complicated multi-stage process. P&G has known this for decades and this is precisely the reason why the agreement is drafted the way that it is. In order to meet P&G's historical demand, the parties agreed to construct huge chemical facilities on FutureFuel's site. These chemical facilities require significant volumes of different raw materials and generate multiple stages of work in process materials to produce the NOBS required for P&G's demand. As demand for powdered laundry detergent has declined based on consumer preference for liquid laundry detergent, P&G believes it can simply let the agreement "expire" thereby shifting all P&G allocated costs for final accounting under the agreement from P&G to FutureFuel.

2. As a result, there is an actual and continuing controversy between FutureFuel and P&G with respect to the Purchase Agreement (the "Agreement") between the parties. More specifically, P&G notified FutureFuel in 2019 that it did not intend to place any additional orders of NOBS under the Agreement, that it did not intend to negotiate a new agreement for future NOBS

orders, and that it was not terminating the Agreement. Section 7.3 of the Agreement, which becomes effective "[u]pon the termination of this AGREEMENT for any reason," unequivocally provides that P&G shall pay the cost of finished and unfinished product in FutureFuel's custody and that the same shall be delivered to P&G at P&G's expense or disposed of as instructed by P&G at P&G's expense. FutureFuel provided P&G with an estimate of the final accounting for the finished and unfinished product to be returned to P&G or disposed of at P&G's discretion. Despite the express terms of Section 7.3 and the Parties' previous understanding over their approximately 40-year relationship that P&G would either pay for delivery of the excess production materials or direct FutureFuel as to the disposal of these materials at P&G's expense at the conclusion of the Agreement and the relationship, P&G has ignored its obligations under Section 7.3 upon the theory that Section 7.3 will not apply if P&G simply lets the Agreement expire.

3. FutureFuel, thereafter, expressly provided notice of discontinuance of the Agreement in its December 10, 2019 letter to P&G to dispel any doubt regarding the Agreement's termination at the end of the 365 day notice period. However, in complete disregard of the plain language of Section 7.3 and in contrast to its previous position, P&G denied its application and also specified that FutureFuel's express termination does not invoke Section 7.3 at any time because there are "no open orders" or any contemplation of open orders between the parties. P&G's position regarding Section 7.3's applicability is unreasonable, is not supported by any provision of the Agreement, and will result in over $1,000,000 in damages to FutureFuel. FutureFuel requests that the Court enforce the Agreement between the Parties, as provided in the plain language of the Agreement and as contemplated by their approximately 40-year business relationship.

4. For these reasons, FutureFuel seeks a declaration that its December 10, 2019 letter to P&G constituted notice of discontinuance pursuant to Section 4.3 and that the Agreement will, therefore, terminate on December 10, 2020, at which time Section 7.3 will be invoked and applicable. Alternatively, FutureFuel seeks a declaration that Section 7.3 of the Agreement is invoked and applicable upon termination of the Agreement, and that the language "termination for any reason" contained in Section 7.3 of the Agreement includes termination by expiration of the Agreement.

## PARTIES

5. FutureFuel is an Arkansas corporation with its principal place of business in Batesville, Arkansas.

6. The Procter & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

7. Upon information and belief, Procter & Gamble International Operations SA Singapore Branch is registered in Singapore, and is a subsidiary of The Procter & Gamble Company.

8. Upon information and belief, Procter & Gamble Manufacturing Mexico S. de R.L. de C.V. is registered in Mexico, and is a subsidiary of The Procter & Gamble Company.

## JURISDICTION AND VENUE

9. This is an action for declaratory relief under Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201-2202. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 2201 because there is a real and justiciable controversy between the parties to this action with respect to their rights, liabilities and obligations under the Agreement. A judicial declaration of the parties' rights and obligations under the Agreement is necessary to eliminate the controversy and uncertainty affecting the parties.

10. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it involves citizens of different states and the alleged amount in controversy exceeds $75,000 exclusive of interest and costs.

11. This Court has personal jurisdiction over The Procter & Gamble Company because it is incorporated in Ohio and Ohio is its principal place of business.

12. This Court has personal jurisdiction over Procter & Gamble International Operations SA Singapore Branch because it contracts to supply services or goods in Ohio, and upon information and belief, transacts business in Ohio.

13. This Court has personal jurisdiction over Procter & Gamble Manufacturing Mexico because it contracts to supply services or goods in Ohio, and upon information and belief, transacts business in Ohio.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because The Procter & Gamble Company is an Ohio corporation with its principal place of business in this district, and, therefore, resides in this district, and a substantial part of the events and occurrences giving rise to this dispute occurred in this district. Upon information and belief, both the Procter & Gamble International Operations SA Singapore Branch and Procter & Gamble Manufacturing Mexico contract to supply services or goods in Ohio and conduct business in this district, and are, therefore, also subject to jurisdiction in this district.

## FACTUAL ALLEGATIONS

15. FutureFuel is a specialty chemical manufacturer and a leader in the U.S. biofuel industry. For nearly 40 years, FutureFuel has been the sole manufacturer of NOBS, a leading bleach activator used in powder laundry detergents that performs in cold water.

16. Manufacturing NOBS is a large-scale, extensive, multi-stage process which takes place in a large production facility. The equipment used to produce NOBS includes a large-scale

continuous reactor with an annual design capacity of 60 million pounds. This process involves synthesizing various raw materials in multiple stages into a powder, which will later be converted into small extruded NOBS pellets meeting P&G's specifications. As a result of this complexity, on the completion of each production run of NOBS for P&G and irrespective of order size or quantity of production runs, there are always significant raw materials and work in process materials remaining in tanks, transfer lines and other areas of the complex production facility, which is depicted below:



17. FutureFuel and P&G entered into the Agreement, effective May 8, 2018, a copy of which is attached hereto as **Exhibit A**. The Agreement lays out the terms of the sale of NOBS by FutureFuel to P&G through December 31, 2020. Specifically, the Agreement provides that P&G

must purchase a first order of NOBS and contemplated the opportunity for P&G to purchase a second order of NOBS.

18. By email dated May 21, 2019, a copy of which is attached hereto as **Exhibit B**, P&G notified FutureFuel that "P&G will not be requesting a second order of NOBS to be made by FutureFuel under the Purchase Agreement."

19. By letter dated June 3, 2019, a copy of which is attached hereto as **Exhibit C**, FutureFuel responded to P&G that, "[u]nder section 7.3 of [the Agreement], we will need to conduct a final accounting of P&G dedicated raw materials and work-in-process in our custody" and provided P&G with a "preliminary estimate of the final accounting" that totaled $1,296,063. FutureFuel represented that "[f]inal disposal and shipping costs will be calculated once we receive your instruction on how to proceed."

20. Specifically, section 7.3 of the Agreement lays out the terms of final accounting of the remaining materials used in the extensive production of NOBS and provides as follows:

> Upon termination of the AGREEMENT *for any reason*, all ACID (other than ACID to be used by SELLER in the manufacture of POWDER for sale to outside PARTIES), un-stabilized GOODS (other than inventory and work-in-process held by SELLER for the manufacture of POWDER for sale to OUTSIDE PARTIES) and GOODS in SELLER'S custody (other than GOODS held by SELLER for sale to OUTSIDE PARTY) shall be delivered to BUYER or shall be disposed of lawfully as instructed by BUYER. Upon BUYER'S request, SELLER will make all reasonable efforts to convert un-stabilized GOODS (other than inventory and work in-process held by SELLER for the manufacture of POWDER for sale to OUTSIDE PARTIES) into GOODS meeting SPECIFICATIONS. BUYER shall pay all shipping charges, cost of material, cost to destroy any such materials and the PRICE for all such unstabilized GOODS converted into GOODS meeting SPECIFICATIONS, except in the case of termination of this AGREEMENT due to breach by the SELLER, in which case SELLER shall pay said charges and costs. After final arrangements have been made for the disposal or shipment thereof, as applicable, SELLER shall send a final invoice and accounting summary to BUYER, which shall specify any amount owed to SELLER. Final amounts outstanding shall be payable net 30 days after receipt on invoice and statement.

(emphasis added).[1]

21. On November 22, 2019, P&G responded to FutureFuel with the following email correspondence, a copy of which is attached hereto as **Exhibit D**:

> . . . I am writing to formalize P&G's position.
>
> Whilst we have confirmed to you that we do not intend to place a SECOND ORDER, as defined and permitted in clause 4 of the agreement between ourselves, ***we do not intend to terminate the agreement***. The agreement will therefore simply expire at the end of the term. There is a difference between expiration and termination. As such, Section 7.3 of the agreement does not apply. . . .
>
> With the above being P&G's position (relative to Section 7.3), we do not believe that formal disposition approval is needed to be authored. However, as part of our long-standing relationship, I am willing to confirm that P&G will not be requesting an additional run of NOBS under the current contract nor will P&G be requesting to negotiate a new contract for NOBS, beyond the second run that is available under the current agreement. With this, I believe that [FutureFuel] should begin to manage the disposition of the material in a safe and responsible manner that minimizes costs and recovers as much value as possible for [FutureFuel] ultimately though this is [FutureFuel's] decision as P&G has no liability in relation to remnant stock.

(emphasis added).

22. To dispel any doubt as to whether the agreement will terminate, FutureFuel invoked its rights to terminate on December 10, 2019, with the following correspondence to P&G, a copy of which is attached hereto as **Exhibit E**:

> As explained during our call, the NOBS production process is multi-step, large-scale, and continuous. As a result, there are significant quantities of materials throughout the process in different stages and as such there will always be remaining materials in the equipment upon cessation of production. This has been known by the parties since inception of the project. Indeed, the entire purpose

---

[1] POWDER, ACID, stabilized GOODS, and un-stabilized GOODS are used or produced at different stages in NOBS production. During production, NOBS is synthesized in multiple stages into a powder before going into a final finishing step to convert the powder into small extruded pellets. In Section 7.3 of the Agreement, ACID refers to Pelargonic Acid, which is the most expensive raw material used in production of NOBS, and represents approximately 50% of the final accounting amount under Section 7.3 of the Agreement (excluding disposal and shipping costs). In the Agreement, stabilized GOODS refers to the finished stabilized NOBS extruded pellets which meets P&G specifications. Finally, un-stabilized GOODS refers to other raw material inventory excluding ACID, and also includes work in process material in different stages of synthesis.

underlying inclusion of Section 7.3 (Final Accounting) of the Agreement was to account for these remaining materials upon termination of the Agreement.

P&G's effort to differentiate between "expiration" and "termination" appears to be little more than an attempt [to] employ semantics to avoid its obligations under Section 7.3 to both pay for and dispose of the production materials remaining at the end of the Agreement. The concept of a "final accounting" is hardly novel. On the contrary, some sort of final account, invoice or other statement would be expected upon conclusion of an ongoing production contract, particularly one which extends over a period of years.

In this instance, Section 7.3 identifies specific obligations for both P&G and FutureFuel with respect to the final accounting at the conclusion of their relationship. Additionally, the very first sentence of Section 7.3 unequivocally imposes these obligations, "[u]pon termination of this AGREEMENT for any reason . . ."

**However, to dispel any doubt concerning the applicability of Section 7.3 to the current situation, this letter hereby constitutes the 365 calendar day written notice, in accordance with Section 4.3 of the Agreement, that FutureFuel will be discontinuing all activities relating to production of NOBS. Pursuant to Section 4.3, the Agreement will be terminated at the end of this 365 day period, unless the parties are able to negotiate a mutually acceptable alternative.**

23.     Specifically, Section 4.3 provides, in part:

SELLER acknowledges and agrees that BUYER may deem it necessary, for a variety of business and/or technical reasons, at a future date to discontinue the purchases of GOODS covered by this AGREEMENT. Further, BUYER acknowledges and agrees that SELLER may deem it necessary, for a variety of business and/or technical reasons to discontinue GOODS production covered under this AGREEMENT. In such event that BUYER/SELLER expects to discontinue purchases/production of GOODS covered under this AGREEMENT, BUYER/SELLER shall provide BUYER/SELLER with reasonable, but not less than three hundred and sixty five (365) calendar days, prior written notice of such discontinuance. During the three hundred and sixty five (365) days notification period, BUYER and SELLER will meet in good faith to agree on final volume to be produced by SELLER or BUYER. BUYER will continue purchasing goods at the agreed upon volume forecast for the calendar year and SELLER will continue selling GOODS at the agreed upon volume forecast for that calendar year. ***At the end of the three hundred and sixty five (365) day notification period, the AGREEMENT will be terminated*** unless both parties negotiate a mutually acceptable alternative before the expiration of the three hundred and sixty five (365) day notification period.

(emphasis added).

24. By letter dated January 3, 2020, a copy of which is attached hereto as **Exhibit F**, P&G again replied that

> Clause 7.3 clearly does not [apply] if FutureFuel terminates the Agreement when there are no open orders or contemplation of such orders. Accordingly we remain of the opinion that there is no obligation for us to pay for the acids/materials detailed in your letter of 3 June. We would therefore strongly recommend you do everything you can to re-use or re-sell them.

25. The Agreement, however, is devoid of any provision that would limit the applicability of Section 7.3 to only terminations where there are open orders or contemplation of open orders.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment as to the Termination Date)**

26. FutureFuel incorporates the foregoing allegations as if fully rewritten herein.

27. Section 7.3 provides that the final accounting provision of Section 7.3 becomes effective "[u]pon the termination of this AGREEMENT for any reason," and provides that finished and unfinished product in FutureFuel's custody shall be delivered to P&G at P&G's expense or disposed of as instructed by P&G at P&G's expense.

28. Section 4.3 of the Agreement allows either party to terminate the agreement provided that the terminating party gives 365 days written notice of discontinuance. At the end of the 365-day notice period, absent any mutual negotiation to the contrary, the Agreement terminates, therefore, invoking Section 7.3.

29. P&G denies that Section 7.3 will apply upon the expiration of the 365-day notification period and alleges that Section 7.3 "clearly does not [apply] if FutureFuel terminates the Agreement when there are no open orders or contemplation of such orders."

30. A justiciable controversy exists regarding the rights, liabilities, and obligations of the parties under the Agreement.

31. Accordingly, FutureFuel requests a declaration from this Court that its December 10, 2019 letter to P&G constituted notice of discontinuance pursuant to Section 4.3 and that the Agreement will, therefore, terminate on December 10, 2020, at which time Section 7.3 will be invoked and applicable.

### SECOND CLAIM FOR RELIEF
**(Declarative Judgment as to the Enforceability of Section 7.3 Upon Any Termination of the Agreement)**

32. FutureFuel incorporates the foregoing allegations as if fully rewritten herein.

33. In response to P&G's position that Section 7.3 is not applicable and that P&G will not comply with its obligations under that section, FutureFuel sent P&G a letter dated December 10, 2019, in which FutureFuel tendered its "365 calendar day written notice, in accordance with Section 4.3 of the Agreement, [and] that FutureFuel will be discontinuing all activities relating to production of NOBS."

34. P&G denies that Section 7.3 is applicable now, or at any time in the future, and refuses to bear the cost of delivery or disposal of the unfinished product pursuant to Section 7.3.

35. A justiciable controversy exists regarding the rights, liabilities, and obligations of the parties under the Agreement.

36. Accordingly, FutureFuel respectfully requests a declaration from this Court that Section 7.3 of the Agreement is invoked and applicable upon termination of the Agreement, and that the language "termination for any reason" contained in Section 7.3 of the Agreement includes termination by expiration of the Agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** FutureFuel demands judgment against P&G as follows:

(A) For a declaratory judgment that its December 10, 2019 letter to P&G constituted notice of discontinuance pursuant to Section 4.3 and that the Agreement will terminate on December 10, 2020, at which time Section 7.3 will be invoked and applicable;

(B) For a declaratory judgment that Section 7.3 of the Agreement is invoked and applicable upon termination, and that the language "termination for any reason" contained in Section 7.3 of the Agreement includes termination by expiration of the Agreement;

(C) For costs incurred pursuant to law; and

(D) For such other relief that the Court deems fair and equitable.

/s/ J.B. Lind
J.B. Lind (0083310)
Erin D. French (0090813)
VORYS, SATER, SEYMOUR AND PEASE, LLP
301 East Fourth Street
Great American Tower, Suite 3500
Cincinnati, OH 45202
(513) 842-8119
(513) 723-4022
jblind@vorys.com
edfrench@vorys.com

*Attorneys for FutureFuel Chemical Company*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable in the above-referenced matter.

DATED this 3rd day of March, 2020.

/s/ J.B. Lind
J.B. Lind