**PURCHASE AGREEMENT**
**[Raw/Pack]**

This is an agreement, ("AGREEMENT"), made and entered into as of May 8, 2018 between the BUYER and SELLER (each individually, a "PARTY", and collectively, the "PARTIES").

## 1 PARTIES

The Procter & Gamble Company, One Procter & Gamble Plaza, Cincinnati, Ohio 45202, United States of America;
Procter & Gamble International Operations SA Singapore Branch, 80 Raffles Place, #32-01 UOB Plaza, Singapore, Singapore:
Procter & Gamble Manufacturing Mexico S. de R.L. de C.V., Loma de las Palmas # 18, Lomas de Vista Hermosa, Cuajimalpa de Morelos, Ciudad de Mexico, 05100, Mexico (each such entity, individually and collectively, "BUYER").

FutureFuel Chemical Company, 2800 Gap Road, Batesville, AR 72501, United States of America ("SELLER").

### 1.1 MULTIPLE BUYER

The PARTIES hereby acknowledge and agree that (i) the obligations of SELLER hereunder are for the benefit of, and may be enforced by, each respective BUYER; and (ii) no BUYER shall have any liability to SELLER or any third party hereunder with respect to any breach or obligation of any other BUYER.

## 2 PURCHASE & SALE OBLIGATIONS

### 2.1 GOODS; SPECIFICATIONS

SELLER shall sell and BUYER shall purchase stabilized sodium salt of Nonanoyloxy Benzene Sulfonate (NOBS) in accordance with the terms and conditions set forth in this AGREEMENT ("GOODS") in strict compliance with the specifications as set forth in BUYER's Specification Sheet(s) RMS 10090497 which are attached hereto as Exhibit 1 and incorporated herein by reference and forming a part hereof and as may be amended from time to time in accordance with the Section entitled SPECIFICATION CHANGES ("SPECIFICATIONS").

### 2.2 SPECFICATION CHANGES

#### 2.2.1 GENERAL

From time to time, BUYER may in good faith revise, supplement or otherwise amend the SPECIFCATIONS by written notice to SELLER. These revised SPECIFICATIONS shall become effective sixty (60) calendar days after SELLER's receipt of such notice ("CHANGE DATE") unless SELLER provides BUYER with a written objection prior to the CHANGE DATE ("OBJECTION"). SELLER shall act in good faith and use commercially reasonable efforts to accept each revised SPECIFICATIONS. If SELLER ships GOODS against a PURCHASE ORDER (as defined below) requesting GOODS in accordance with the revised SPECIFICATIONS, or if SELLER fails to provide the OBJECTION within such 60-day period, then such revised SPECIFICATIONS shall replace the prior SPECIFICATIONS for purposes of this AGREEMENT. Notwithstanding anything in this Agreement, no revision of, supplement to, amendment of, or other changes to SPECIFICATIONS shall be permitted on GOODS already ordered by BUYER, in process of production or already produced by SELLER.

#### 2.2.2 OBJECTION

If SELLER provides an OBJECTION prior to the CHANGE DATE, the PARTIES shall promptly discuss the reason for the OBJECTION and attempt in good faith and with commercially reasonable efforts to resolve the same. If the PARTIES cannot resolve the OBEJCTION within ninety (90) calendar days after the CHANGE DATE, then BUYER shall be entitled to immediately (but, not with respect to any GOODS already ordered by BUYER, in process of production or already produced by SELLER) (i) terminate this AGREEMENT without any penalty, liability or further obligation except as otherwise set forth herein, (ii) purchase the GOODS from other suppliers in which case the obligations of BUYER and SELLER hereunder shall be reduced accordingly; or (iii) continue purchases under this AGREEMENT in which case the SPECIFICATIONS shall not be revised. BUYER must notify SELLER within thirty (30) days after the end of such 90-day period as to which of clauses (i), (ii), or (iii) it has elected.

### 2.3 PRODUCTION PROCESS AND/OR RAW MATERIAL CHANGES

SELLER shall not make any changes to the raw and pack material feedstock or any portion or component of the GOODS, or any material change to the production process or the production equipment relating to SELLER's performance under this AGREEMENT, unless and until SELLER has obtained BUYER's prior written consent. BUYER shall be entitled to reject any such change, in its sole discretion.

EXHIBIT A

Notwithstanding the foregoing or anything to the contrary in this AGREEMENT, SELLER shall have the option to directly or indirectly procure any or all raw materials used to manufacture GOODS for any or all sales so long as such procurement does not cause a material pricing difference and is acceptable to both parties. SELLER shall communicate any such decision to BUYER and the PARTIES shall use commercially reasonable efforts to transition such procurement of raw materials to SELLER.

**2.4 MATERIAL, PRODUCT OR EQUIPMENT DISPOSAL**

In the event that any material, product, or equipment, including, but not limited to, packaging materials, printing plates, molds, formulations, fragrances and ingredients, which incorporates BUYER's IP RIGHTS (as defined below) requires disposal ("DISPOSAL ITEM") while under SELLER's ownership or control, SELLER is responsible for ensuring that such disposal is carried out under SELLER's direct control and full supervision in order to ensure that the DISPOSAL ITEM is made entirely unsalvageable. SELLER shall not contract out such disposal or involve any third parties in this process without the prior written consent of BUYER provided that SELLER may dispose of a DISPOSAL ITEM as entirely unsalvageable waste with any duly licensed landfill or waste disposal site without BUYER's prior written consent. Upon expiration or termination of this AGREEMENT, SELLER shall compile an inventory of currently held materials identifying all DISPOSAL ITEMS for agreement with BUYER as to which items require disposal in accordance with the procedure described above. SELLER is responsible for taking all commercially reasonable steps to prevent the counterfeiting of BUYER's current or previously marketed products or the infringement of BUYER's IP RIGHTS resulting from the use of any DISPOSAL ITEMS.

**3. QUALITY AND ACCEPTANCE**

**3.1 QUALITY**

The GOODS shall be in strict compliance with the SPECIFCATIONS and in accordance with the terms and conditions set forth in this AGREEMENT.

**3.2 ACCEPTANCE**

Notwithstanding BUYER's acceptance of any GOODS, BUYER shall, for a period of 90 days after receipt of GOODS at the BUYER's applicable manufacturing facility, continue to have the right to revoke such acceptance with respect to all or any portion of such GOODS that BUYER reasonably determines do not meet the terms and conditions set forth in this AGREEMENT. After such 90-day period, such GOODS will be deemed to be in compliance with the SPEFICIATIONS.

**3.3 RETURN, REWORK & SCRAPPING**

Any GOODS DELIVERED (as defined below) by SELLER to BUYER that are not in full compliance with the SPECIFICATIONS may, upon mutual agreement between BUYER and SELLER made within five (5) calendar days after BUYER's notice to SELLER, be (i) return to SELLER at SELLER's expense for credit to BUYER at the full PRICE (as defined below) plus all cost and expenses associated with such return, including, without limitation, payment or reimbursement for customs duties and freight charges; (ii) scrapped by BUYER, at SELLER's expense, in which case BUYER shall be relieved of any payment obligations with respect to such GOODS, or (iii) reworked by SELLER, at SELLER's expense. The rights and remedies set forth in this Section are not exclusive and nothing herein shall limit the rights and remedies either PARTY may have under this AGREEMENT or at LAW (defined below).

**4 QUANTITY**

**4.1. PURCHASE & SALE OBLIGATIONS**

During the PERIOD (as defined below) and in accordance with the terms and conditions set forth in this AGREEMENT, SELLER shall sell and BUYER shall purchase 100% of BUYER's requirements for GOODS.

On the EFFECTIVE DATE, BUYER hereby agrees to purchase from SELLER and SELLER hereby agrees to sell to BUYER 5.0 million pounds of GOODS (100% active basis) (such purchase and sale, the "FIRST ORDER"). The PARTIES acknowledge and agree that SELLER shall produce all GOODS for the FIRST ORDER in one production campaign beginning in or around June 2018. BUYER agrees to take DELIVERY of all GOODS relating to the FIRST ORDER and make payment for all GOODS relating to the FIRST ORDER.

In addition to the FIRST ORDER, BUYER'S purchase commitment of GOODS from SELLER is estimated to be 4.0 million pounds (100% active basis) (the "ESTIMATE"). For purposes of clarification, the ESTIMATE is an estimate as of EFFECTIVE DATE and shall not be construed as purchase commitment. Any binding purchase commitment in addition to the FIRST ORDER must (a) be for at least 4.0 million pounds of GOODS and (b) provide SELLER with at least three (3) months' lead time to procure applicable raw materials for the GOODS (any such purchase and sale, the "SECOND ORDER"). The PARTIES acknowledge and agree that SELLER shall produce all GOODS for the SECOND ORDER in one production campaign upon BUYER's request. BUYER agrees to take DELIVERY of all GOODS relating to the SECOND ORDER and make payment for all GOODS relating to the SECOND ORDER. The rights and

obligations as set forth in this provision shall survive the termination or expiration of this AGREEMENT if the DELIVERY and payment for the SECOND ORDER is not fulfilled by such termination or expiration.

Base price during the PERIOD - $2.80 per pound (the "BASE PRICE")

Quarterly pricing adjustment for raw materials are in accordance with Exhibit 2A (NOTE: BASE PRICE CALENDAR YEAR 2018-2020 is based on pricing of key raw materials Pelargonic Acid (C9) at $1.26/lb, Phenol at $0.45/lb and Acetic Anhydride at $1.00/lb at May 30, 2015).

In order to facilitate SELLER production, BUYER and SELLER shall meet at least quarterly at which meetings BUYER shall present to SELLER BUYER'S then good faith 12-month rolling forecasted volume of GOODS.

During the PERIOD, BUYER shall offer SELLER the first right of refusal to supply NOBS-derived material for use as bleach activator for BUYER's requirements. BUYER shall give written notice to SELLER at least six (6) months prior to the need for such NOBS-derived material, and SELLER shall have sixty (60) days from BUYER's notification to provide a commercial proposal in writing to supply such NOBS-derived material. SELLER's proposal shall constitute a commitment to make such NOBS-derived material available to BUYER, on mutually agreed terms, on or before six (6) months from the date of BUYER's initial written notice to SELLER. If SELLER declines to supply such NOBS-derived material or if BUYER and SELLER cannot agree in good faith on commercial terms for such supply within thirty (30) days from BUYER's receipt of proposal from SELLER, then BUYER's obligation to purchase its requirements of NOBS-derived material from SELLER will be waived.

**4.2 PURCHASE ORDERS**

In order to aid in the administration and timing for DELIVERY and payment for all GOODS, from time to time during the PERIOD of this AGREEMENT, BUYER may request GOODS from SELLER pursuant to and in accordance with separate BUYER forms of purchase orders, releases or other related documentation (collectively "PURCHASE ORDERS"). Such PURCHASE ORDERS shall specify quantities of GOODS, shipping instructions, delivery date(s) and detailed instructions for the delivery of GOODS (with release schedules, delivery orders or equivalent notices). Each PURCHASE ORDER shall be binding upon SELLER and BUYER, and shall be deemed to constitute a part of this AGREEMENT as if fully set forth herein, and all terms and conditions of this AGREEMENT shall be deemed to apply to the subject matter of such PURCHASE ORDER as if fully set forth therein. In the event of any conflict or inconsistency between the terms of this AGREEMENT and the terms of any PURCHASE ORDER, the terms of this AGREEMENT shall prevail.

**4.3 REDUCTION OR DISCONTINUANCE OF PURHCASES**

SELLER acknowledges and agrees that BUYER may deem it necessary, for a variety of business and/or technical reasons, at a future date to discontinue the purchases of GOODS covered by this AGREEMENT. Further, BUYER acknowledges and agrees that SELLER may deem it necessary, for a variety of business and/or technical reasons to discontinue GOODS production covered under this AGREEMENT. In such event that BUYER/SELLER expects to discontinue purchases/production of GOODS covered under this AGREEMENT, BUYER/SELLER shall provide BUYER/SELLER with reasonable, but not less than three hundred and sixty-five (365) calendar days', prior written notice of such discontinuance. During the three hundred and sixty-five (365) days notification period, BUYER and SELLER will meet in good faith to agree on final volume to be produced by SELLER for BUYER. BUYER will continue purchasing GOODS at the agreed upon volume forecast for the calendar year and SELLER will continue selling GOODS at the agreed upon volume forecast for that calendar year. At the end of the three hundred and sixty-five (365) day notification period, the AGREEMENT will be terminated unless both parties negotiate a mutually acceptable alternative before the expiration of the three hundred and sixty-five (365) day notification period. Notwithstanding anything in this Agreement to the contrary, the parties intend that the non-terminating party's rights set forth in this Section 4.3 are its exclusive rights and remedy for termination by the terminating party under this Section 4.3.

Notwithstanding the above, neither party may terminate this AGREEMENT pursuant to this Section 4.3, in whole or in part, prior to June 30, 2019. As such neither party shall send notice of termination pursuant to this Section 4.3 prior to June 30, 2018.

**4.6 MAINTENANCE PERIODS**

During each calendar year during the PERIOD, BUYER and SELLER agree to adjust orders, inventories and shipping schedules to allow SELLER twenty-one (21) days of maintenance during which the production of GOODS will be limited. SELLER will plan appropriately to minimize the duration of these maintenance periods. These maintenance periods do not relieve SELLER of its obligations to supply GOODS as herein required.

**4.7 SHIPPING WEIGHTS**
Absent manifest error, SELLER's shipping weights shall govern. Shortages or overages less than 1% of the declared net weight will be disregarded, unless a pattern of shortages occurs. In such case, SELLER will reimburse BUYER for GOODS BUYER paid for but did not receive due to shortages. DELIVERY of a specific shipment that is within 5% of the quantity requested shall be accepted by BUYER as complying with the shipment, although BUYER shall pay for only the quantity of the actual DELIVERY.

**4.8 SUPPLY OF NONANOIC ACID**
SELLER agrees to purchase Nonanoic Acid ("ACID") from a supplier with whom BUYER has contracted, so long as the ACID meets the specification in Exhibit 3 and any modifications agreed upon by the PARTIES in writing. Any new supplier must be acceptable from a quality standpoint to the PARTIES in addition to the ACID therefrom meeting such specifications. Inability to meet BUYER's orders because of an insufficient supply from BUYER's specified source shall not constitute a default hereunder on the part of SELLER. BUYER agrees to provide all necessary information and to assist SELLER's purchase of ACID from BUYER's specified source throughout the PERIOD. Notwithstanding any provision herein to the contrary, SELLER shall have no liability to BUYER for any defects in GOODS which is directly caused by or directly results from a latent defect in the ACID which was unknown to SELLER at the time of use of such ACID, provided such ACID was analyzed in accordance with SELLER's standard procedures upon receipt from BUYER's specified source.

**4.8.1 NONANOIC ACID USE FOR OUTSIDE PARTIES**
BUYER AGREES that SELLER may use ACID purchased from the supplier with whom BUYER has contracted per Section 4.8 of this AGREEMENT to produce POWDER for sale to OUTSIDE PARTIES.

**5 PRICE AND TAXES**

**5.1 PRICE AND DUE DATE FOR PAYMENT**
The price(s) for the GOODS, shall be as set forth in Exhibit 2 ("PRICE"). The PRICE shall include any and all packaging and labeling materials to prepare GOODS for shipping to BUYER's site as described in Exhibit 2, and labor to load GOODS at SELLER's facility on transportation provided in accordance with this AGREEMENT.

**5.1.1 SALES OF POWDER**
BUYER agrees that SELLER may sell GOODS and/or NOBS that does not meet GOODS' SPECIFICATIONS (together with GOODS, "POWDER") to persons or entities not a party of this AGREEMENT ("OUTSIDE PARTIES") and SELLER's rights to sell GOODS to OUTSIDE PARTIES survives the termination of this AGREEMENT. Nothing in this Section 5.1.1 affects BUYERS obligations under Section 4.1.

Nothing in this Section is to be construed as granting a license beyond the license(s) granted in Section 8.3.3.

**5.1.3 MOST FAVORED CUSTOMER**

If during a calendar year SELLER sells any POWDER lower volume to BUYER's volume of GOODS to a customer at a weighted-average price (excluding freight and duties) for such calendar year lower than the ultimate PRICE to BUYER for such calendar year, then SELLER has an obligation to adjust the PRICE for the GOODS for such calendar year to be the same as such weighted-average price (excluding freight and duties) to such OUTSIDE PARTY customer. The preceding sentence does not apply unless BUYER purchases its forecasted volumes for such calendar year, nor does it apply to volumes of POWDER sold to an OUTSIDE PARTY in excess of SELLER's forecasted volume for such calendar year. If SELLER fails to adjust the PRICE as set forth in this Section 5.1.2 within 30 days after the end of the applicable calendar year, then BUYER, to the extent legally permissible, is entitled to: (i) terminate this AGREEMENT at any reasonable time thereafter with immediate effect and without any penalty, liability or further obligation; or (ii) purchase the GOODS from other Suppliers, in which case the obligations of BUYER and SELLER under this AGREEMENT, if any, will be reduced accordingly. At BUYER's request, SELLER will certify SELLER's compliance with this Section 5.1.3 and, to the extent legally permissible, will provide all information that BUYER reasonably requests in order to verify compliance.

The foregoing provisions of this Section 5.1.3 shall not apply if:

1) SELLER supplies POWDER to outside company for evaluation and/or qualification purposes (not for commercial production to make finished products for sale).
2) SELLER enters into contract(s) with outside company (companies) at price(s) in compliance with this clause but, later on, uncontrollable factors (e.g. exchange rate variation (cause BUYER's price to be higher than outside company (companies').
3) SELLER supplies POWDER to an outside company (companies) at weighted-average price not great than 10% less than BUYER's weighted-average price for that calendar year, or

4) SELLER develops an alternative lower cost POWDER that is outside GOODS specifications.

**5.2 TAXES**
BUYER and SELLER hereby agree that the PRICE does not include any sales, use, excise, value-added, services, consumption or other tax or duty applicable to the sale of GOODS hereunder ("TAXES"), the taxable incident of which applies to such sale or occurs after BUYER's receipt of title. Rather, such TAXES (excluding SELLER's income taxes or taxes based on or measured by income (are the responsibility of BUYER consistent with this Section 5.2, to the extent applicable out-of-state or out-of-country sales or use of equipment, materials or services, and other exemption certificates or information reasonably by SELLER.

**5.3 AUDIT CLAUSE**
Since this AGREEMENT allows SELLER to pass through cost changes as part of the pricing provisions of Article 5, SELLER shall maintain all documentation in support of such changes for at least two (2) years following the date of the change. BUYER shall have the right to request an audit of SELLER's supporting documentation, including price change and rebate notification letter from material suppliers, within one (1) year after the change, upon thirty (30) days prior written notice to SELLER. BUYER shall conduct no more than one audit each calendar year. BUYER and SELLER shall mutually agree on the date, time and location of the audit. The audit shall be conducted by BUYER's Internal Controls Department or other mutually agreeable independent third party at BUYER's cost. The auditor shall maintain the confidentiality of all data reviewed which was not previously known by the auditor or available to third parties on a non-confidential basis. This obligation of confidentiality shall continue until the material becomes generally available to the public, is shared with others by the SELLER on a non-confidential basis, is available to the auditor from third parties on a non-confidentially basis or upon expiration of a period of three years following the date of the audit, whichever occurs first. The auditor shall return to the SELLER all materials submitted to the auditor, and destroy all working papers, notes, memoranda, reports and other derivatives thereof, upon conclusion of the audit and resolution of any disputed amounts; provided, however the auditor retains one archival copy of the foregoing solely for the purpose of administering its confidentiality obligations. The auditor shall share with the BUYER only the results of the audit. In the event the audit does not support price changes that have been implemented and/or proposed, BUYER and SELLER will meet to review the results and make any appropriate pricing adjustments.

**6 CONTRACT PERIOD AND TERMINATION**

**6.1 CONTRACT PERIOD** May 8th Pf
This AGREEMENT starts on ~~March 1~~, 2018 ("EFFECTIVE DATE") and ends on December 31, 2020 ("PERIOD"), unless earlier terminated in accordance with this AGREEMENT.

**6.2 TERMINATION DUE TO BREACH**

**6.2.1 EARLY TERMINATION**
In the event that (i) a PARTY breaches any material representation, warranty, covenant, or other material obligation set forth in this AGREEMENT, and fails to cure such breach as promptly as practicable but in the vent within sixty (60) day notice of such breach by the other PARTY; or (ii) a PARTY terminates or liquidates its business; then the other PARTY shall be entitled to (a) terminate this AGREEMENT at any reasonable time thereafter with immediate effect and without any penalty, liability or further obligation (b) in the case of BUYER, purchase GOODS from other suppliers, in which case the obligations of BUYER and SELLER hereunder shall be reduced accordingly; or (c) in the case of BUYER, continue purchases under this AGREEMETN. If this AGREEMENT is terminated because of BUYER's breach or termination or liquidation of its business BUYER is obligated to pay for any GOODS shipped as of the termination date, plus any inventory and work-in-process held for the manufacture of GOODS (other than inventory and work-in-process held by SELLER for the manufacture of POWDER for sale to OUTSIDE PARTIES). The termination provisions set out in this Section are not exclusive, and, subject to the limitations set forth herein, are in addition to, and not in limitation of, the PARTIES' rights under this AGREEMENT or at LAW. Notwithstanding anything set forth in this Section, a breach hereunder by one PARTY constituting BUYER will be deemed a breach hereunder by all PARTIES constituting BUYER.

**6.2.2 LEGITIMATE DISPUTES**
This Section 6.2.2 shall not be construed as giving either BUYER or SELLER a right to terminate this AGREEMENT where a legitimate dispute arises between the PARTIES as to applicability and/or enforcement of any provision hereof.

**6.3 EFFECT OF TERMINATION**
Termination or expiration of this AGREEMENT shall not relieve either PARTY of any liability or obligation it may have to other arising out of or related to acts or omissions occurring prior to such termination or expiration. In case of termination of this AGREEMENT by BUYER or expiration of this AGREEMNT other than as result of BUYER's breach, SELLER shall make available for BUYER's immediate removal of BUYER's property then in the possession of SELLER or any of its subcontractors, or under SELLER's or any of its subcontractor's control.

**7 SHIPPING, PAYMENT & DELIVERY**

**7.1 SHIPMENT TERMS; TITLE AND RISK OF LOSS**
Ex-Works SELLER's site at Batesville, Arkansas, USA. As used in this AGREEMENT, the term "DELIVERY" and its derivatives mean delivery as specified in INCTOTERMS 2010. SELLER shall retain title and risk of loss for GOODS in accordance with these terms, except that SELLER will retain the additional responsibility of loading the GOODS at SELLER's facility in appropriate packaging on transportation provided by BUYER in accordance with this AGREEMENT, at which point title of GOODS will transfer to BUYER. Other materials, including raw materials purchased by SELLER, co-products, waste and residues resulting from the production of GOODS shall be the property of SELLER. SELLER has title of raw materials and related to inventories of POWDER manufactured by SELLER for sale to OUTSIDE PARTIES.

**7.2 PAYMENT TERMS**
The due date for payment is seventy-five (75) calendar days from the date the accurate invoice is received at the location as designated by BUYER. In no event will payment occur prior to BUYER's receipt of the GOODS, or if required, prior to the date where BUYER obtains government approval for payment, whoever is later. BUYER may withhold payment if SELLER's invoice is inaccurate or does not meet BUYER's invoice requirements or if SELLER's invoice does not meet legal or tax requirements. Each invoice submitted by SELLER will describe the work performed and the corresponding charges in a manner reasonably satisfactory to BUYER. BUYER's invoice requirements are posted at http://www.pgsupplier.com/en/current0suppliers/invoicing.shtml.

**7.3 FINAL ACCOUNTING**
Upon the termination of this AGREEMENT for any reason, all ACID (other than ACID to be used by SELLER in the manufacture of POWDER for sale to outside PARTIES), un-stabilized GOODS (other than inventory and work-in-process held by SELLER for the manufacture of POWDER for sale to OUTSIDE PARTIES) and GOODS in SELLER's custody (other than GOODS held by SELLER for sale to OUTSIDE PARTY) shall be delivered to BUYER or shall be disposed of lawfully as instructed by BUYER. Upon BUYER's request, SELLER will make all reasonable efforts to convert un-stabilized GOODS (other than inventory and work-in-process held by SELLER for the manufacture of POWDER for sale to OUTSIDE PARTIES) into GOODS meeting SPECIFICATIONS. BUYER shall pay all shipping charges, cost of material, cost to destroy any such materials and the PRICE for all such unstabilized GOODS converted into GOODS meeting SPECIFICATIONS, except in the case of termination of this AGREEMENT due to breach by SELLER, in which case SELLER shall pay said charges and costs. After final arrangements have been made for the disposal or shipment thereof, as applicable, SELLER shall send a final invoice and accounting summary to BUYER, which shall specify any amount owed to SELLER. Final amounts outstanding shall be payable net 30 days after receipt on invoice and statement.

**7.4 LOADING PROCEDURES**
SELLER will follow mutually agreed loading procedures for BUYER provided transportation. SELLER will not load any suspect carriers and will notify BUYER promptly of the same. Further, while carriers are on SELLER's property, SELLER will take reasonable measures to protect such carriers against tampering.

**7.5 LATE PAYMENTS** If any amount due SELLER hereunder (which is not the subject of a good faith dispute) is not paid within 30 days of its due date, and SELLER has promptly notified BUYER in writing of such unpaid amount, notwithstanding any other provision hereof, SELLER may suspend shipments of GOODS until such payment is received by SELLER.

**8 REPRESENTATIONS, WARRANTIES**

**8.1 REPRESENTATIONS AND WARRANTIES**

SELLER represents and warrants that as of DELIVERY of the GOODS to BUYER, the GOODS shall be in strict compliance with all SPECIFICATIONS applicable to such GOODS and that GOODS will be of workmanship and free from defects. SELLER MAKES NO OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, AS TO FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO GOODS WHETHER USED ALONE OR IN COMBINATION WITH ANY OTHER MATTER.

**8.2 TITLE AND LIENS**

**8.2.1 GOODS**
SELLER represents and warrants that upon DELIVERY of the GOODS that SELLER shall pass to BUYER, and BUYER shall receive, good and marketable title to such GOODS, free and clear of all liens, claims, security interests pledges, charges, mortgages, deeds of trusts, options, or other encumbrances of any kind arising by or through SELLER ("LIENS").

**8.2.2 BUYER's PROPERTY**
SELLER shall at all times keep any of BUYER's property in the possession of SELLER or any of its subcontractors or under SELLER's or any of its subcontractor's control free and clear of any LIENS arising by or through SELLER, and hereby grants BUYER the right to file such protective financing or similar statements to confirm and record BUYER's ownership thereof.

**8.3 INTELLECTUAL PROPERTY RIGHTS**

**8.3.1 OWNERSHIP OF TECHNOLOGY**
All technical data, process information, patents, copyrights, trademarks, trade secrets or similar intellectual property rights (collectively "IP RIGHTS") on un-stabilized and stabilized GOODS obtained from plant operation are the exclusive property of SELLER. All IP RIGHTS received from BUYER for stabilizing GOODS are exclusive property of BUYER. All information available to either PARTY separate from their relationship hereunder is excluded from the foregoing provisions. If either PARTY desires to use the other PARTY's IP RIGHTS with a third party, a mutually agreeable licensing agreement may be negotiated at the option of the licensor. The PARTIES agree that SELLER'S right to sell POWDER to OUTSIDE PARTIES as set forth herein does not violate BUYER'S rights under this Section.

**8.3.2 PATENT INDEMNITY**
SELLER agrees to indemnify BUYER against all damages, costs and expenses which result from claims of infringement of U.S. and non-U.S. patents brought against BUYER on account of the process used by SELLER, using technology selected by SELLER, to manufacture GOODS under this AGREEMENT. BUYER agrees to indemnify SELLER against all damages, costs and expenses which result from a claim infringement of U.S. and non-U.S. patents on account of the manufacturer and sale of GOODS or any part of the GOODS under this AGREEMENT using technology selected by BUYER. Either PARTY claiming indemnity under this Section 8.3.2 shall notify the other PARTY promptly upon receipt of notice of any claim. The indemnitor shall, at its option, have the right to assume the defense of any such lawsuit, and to settle any claim. IF it elects not to assume the defense, the indemnitor shall reimburse reasonable attorney's fees incurred by the indemnitee. The indemnitee agrees to make available any information in its possession reasonably necessary for the defense of such suit.

**8.3.3 GRANT OF LICENSE**
As long as SELLER is supplying GOODS to BUYER, BUYER grants SELLER a fully paid, non-exclusive license, without sublicensing rights, under any BUYER patents protecting processes for the manufacture of GOODS and reduced to practice prior to the termination of this AGREEMENT. As long as this AGREEMENT is in effect, SELLER grants BUYER a fully paid, non-exclusive license, without sub-licensing rights (except as may be specifically set forth herein), under any SELLER patents protecting processes for the manufacture, use, sale, and import of GOODS from fatty acid anhydride and sodium phenol sulfonate and reduce to practice prior to the termination of this AGREEMENT. Despite the foregoing, such license to BUYER will survive termination of this AGREEMENT with respect solely to the use, sale, and import of GOODS purchased by BUYER from SELLER.

**8.4 CORPORATE AUTHORITY**
The PARTIES represent, warrant, and covenant that (i) each PARTY is and shall be at all times a legal entity validly existing under the laws of its jurisdiction with the power to own all of its properties and assets and to carry on its business as it is currently being conducted; (ii) each APRTY has the power to execute and deliver this AGREEMENT and to perform its obligations under this AGREEMENT; (iii) each PARTY's officer executing this AGREEMENT is duly authorized to execute and deliver this AGREEMTN on its behalf, and no further corporate proceedings are necessary with respect thereto; (iv) each PARTY is not required to obtain the consent of any third party, including consent of any party to any contract to which it is a party, in connection with execution and delivery of this AGREEMTN and performance of its obligations under this AGREEMENT; and (v) each PARTY's execution and delivery of this AGREEMENT and performance of its obligations under this AGREEMENT do not (a) violate any provision of its articles of incorporation or by-laws or equivalent corporate provision as currently in effect, or (b) conflict with, result in a breach of, constitute a default under (or an event which, with notice or lapse of time or both, would constitute a default under), accelerate the performance required by, result in the creation of any lien upon any of its properties or asses under, or create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under, any contract to which it is a party or by which any of its properties or assets are bound.

**8.5 COMPLIANCE WITH LAWS AND SAFETY MEASURES**

**8.5.1GENERAL COMPLIANCE WITH LAWS**
SELLER will and will cause any person or entity acting on its behalf to fully comply with all applicable governmental, legal, regulatory and professional requirements, including but not limited to anti-money laundering, anti-corruption and anti-bribery laws (including, without limitation, the Foreign Corrupt Practices Act, the UK Bribery Act and Proceeds of Crime Act, and commercial bribery laws) (collectively "LAWS"). **Unless exempt, SELLER will comply with (i) 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a), prohibiting discrimination against (a) qualified individuals based on their status as protected veterans or individuals with disabilities, and**

**(b) all individuals based on their race, color, religion, sex, sexual orientation, gender identification or national origin. In accordance with 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a), SELLER will take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identification, national origin, protected veteran status or disability; and (ii) 41 CFR § 61-300.10 regarding veterans' employment reports and 29 CFR Part 471, Appendix A to Subpart A regarding posting a notice of employee rights.** The provisions of 41 C.F.R. § 60-1.4. are incorporated into this AGREEMENT by reference. SELLER will promptly notify BUYER if SELLER (i) receives any notice, demand, summons or complaint from any governmental or regulatory authority, agency or other body relating to the subject matter of this AGREEMENT, and will take all steps, at SELLER's expense, to resolve any issues as promptly as practicable or any request or demand in violation of the LAWS or (ii) violates any LAWS.

**8.5.2 ANTI-CORRUPTION COMPLIANCE**

In addition to any other measures necessary to comply with LAWS as described above, SELLER will not and will ensure that any person or entity acting on its behalf will neither (i) offer to pay, pay, promise to pay, or authorize the payment of money or anything of value nor (ii) give or offer any "facilitating" or "grease" payments (i.e. payments given or offered in order to expedite or secure the performance of a routine government action) whether or not those payments may be considered lawful under the applicable anti-bribery laws to any (a) officer, employee or any person acting in an official capacity for or on behalf of a government or an entity owned or controlled by a government, or of a public international organization; or (b) political party or their officials; (c) candidate for a political office ("PUBLIC OFFICIAL") in order to influence any act or decision of the PUBLIC OFFICIAL in his or her official capacity or to secure any other improper advantage in order to obtain or retain business or obtain any other business advantage.

**8.5.3 SELLER DIVERSITY PROGRAM**

If SELLER has operations (production, sales, administrative) located in the United States of America or sells any goods/services to the United States of America which are involved in SELLER's performance under this AGREEMENT, then, to the extent legally permissible, SELLER may develop strategies aimed at meeting the goals of BUYER's minority and women-owned business development program. Such strategies include sourcing methods, goals, reporting and efforts to encourage sub-contractors' use of minority and women-owned vendors. SELLER will use its best commercial efforts to ensure that the use of such minority and women-owned vendors will reach or exceed 0% of BUYER'S annual spend with SELLER under this AGREEMENT.

**8.6 LICENSES, CONSENTS, PERMITS**SELLER represents, warrants, and covenants that SELLER has obtained and maintains in full force and effect all licenses, consents, permits, approvals, authorizations and the like required by LAW to perform SELLER's obligation under this AGREEMENT (collectively "PERMITS"). SELLER shall properly notify BUYER if SELLER receives any notice, demand, summons or complaint from any governmental or regulatory authority, agency or other body relating to the GOODS and parts thereof or SELLER's performance in accordance with this AGREEMENT.

**8.7 UNDULY ONEROUS OR EXPENSIVE**

If in SELLER" s or BUYER's judgement compliance with LAWS or PERMITS made applicable after the EFFECTIVE DATE is unduly onerous or expensive, BUYER and SELLER will endeavor to renegotiate the PRICE. If SELLER and BUYER fail to reach an agreement upon a new PRICE, or cannot agree that such compliance is unduly onerous or expensive, in either case within sixty (60) days after renegotiation is requested, BUYER or SELLER shall thereafter have the right to terminate this AGREEMENT by giving the other PARTY at least sixty (60) days prior written notice of such termination.

**8.8 APPLICABILITY AND SURVIVAL OF REPRESENTATIONS AND WARRANTIES**

SELLER's representations, warrants and covenants set forth in the Section entitled GENRAL REPRESENTATIONS AND WARRANTS shall remain in effect with respect to each delivery of the GOODS to BUYER for a period of ninety (90) days after receipt of GOODS at the BUYER's applicable manufacturing facility. Any other of SELLER's representations, warranties, covenants and other obligations set forth in this AGREEMENT shall be subject to all applicable statutes of limitation, similar statutes and other similar defenses as provided by law or equity.

**9. INDEMIFCIATION AND INSURANCE**

**9.1 SELLER'S INDEMNIFICATION OF BUYER**

Subject to the limitations set forth herein, SELLER shall indemnify and hold BUYER (including BUYER's officers, directors, employees, affiliates, agents, contractors, successors, and assigns) ("BUYER INDEMNITEE") harmless from and against any and all liabilities, claims, demands, damages, costs, expenses (including attorney's fees and internal costs associated with internal attorney work( or money judgements (collectively "CLAIMS") incurred by, or rendered against BUYER (whether based on facts now known or later discovered) arising out of the following (a) the failure of SELLER or those acting under or for SELLER to comply with any federal, state and local LAWS (including those related to the environment, health and safety) in connection with SELLER's performance of this

AGREEMENT (including SELLER's ownership or operation of its business and facilities); (b) any alleged or actual contamination of the environment or damage to natural resources at a facility owned or operated by SELLER or a facility/location selected by SELLER for its disposal of wastes or any other facility which SELLER's wastes may be release or threatened to be released, including any liability imposed by any federal, state or local laws, regulations and ordinances, including CERCLA, RCRA, or comparable and applicable legal statute or regulation or any extension or revision thereof; (c) any alleged or actual damage to any property [including damage to any environmental medium (air, water, groundwater, soil) or to any natural resources] or any alleged or actual injury (including death) of persons (including SELLER's employees or those acting under or for SELLER) arising out of SELLER's performance of this AGREEMENT.

**9.2 BUYER'S INDEMNIFICATION OF SELLER**
Subject to the limitations set forth herein, BUYER shall indemnify and hold SELLER (including SELLER's officers, directors, employees, affiliates, agents, successors, and assigns) "SELLER INDEMNITEE") harmless from and against any and all CLAIMS incurred by, or rendered against SELLER (whether based on facts known or later discovered) arising out of the following: (a) the failure of BUYER or those acting under or for BUYER to comply with any federal, state and local LAWS (including those related to the environmental, health and safety) in connection with BUYER's performance of this AGREEMENT (including BUYER's ownership or operation of its business and facilities); (b) any alleged or actual contamination of the environment or damage to the natural resources at a facility owned or operated by BUYER or a facility/location selected by BUYER for its disposal of wastes or any other facility at which BUYER's wastes may be released or threatened to be released , including any liability imposed by any federal, state or local laws, regulations and ordinances, including CERCLA, RCRA, or comparable and applicable legal statute or regulation or any extension or revision thereof; (c) any alleged or actual damage to any property [including damage to any environmental medium (air, water, groundwater, soil) or to any natural resources] or any alleged or actual injury (including death) of persons (including BUYER's employees or those acting under or for BUYER) arising out of BUYER's performance of this AGREEMENT or BUYER'S breach of any representation, warranty, covenant or other obligation set forth in this AGREEMENT.

**9.3 INDEMNIFICATION PROCEDURES**

**9.3.1 BUYER INDEMNITEE**
BUYER INDEMNITEE shall promptly and in any event within thirty (30) calendar days after receipt of notice of the commencement of any third party legal proceedings against BUYER INDEMNITEE for which indemnity may be sought under this Section 9, notify SELLER thereof; provided that failure to provide such notice shall not relieve SELLER of its indemnity obligations hereunder unless and to the extent SELLER is prejudiced by such delay. Upon BUYER INDEMNITEE's request, SELLER shall assume, at its own expense, the defense of any such third-party CLAIM with reputable counsel reasonably acceptable to BUYER INDEMNITEE. SELLER shall be entitled to settle any such third-party CLAIM, with BUYER INDEMNITEE's written consent (which may be granted or withheld in BUYER INDEMNITEE's sole discretion unless there is a complete settlement which includes a full release of BUYER INDEMNITEE and no payment of money or other consideration by the BUYER INDEMNITEE, in which case BUYER INDEMNITEE's consent is not required). BUYER INDEMNITEE, at SELLER's cost, shall reasonably cooperate with SELLER in the defense of such action as SELLER may reasonably request.

**9.3.2 SELLER INDEMNITEE**
SELLER INDEMNITEE shall promptly and in any event within thirty (30) calendar days after receipt of notice of the commencement of any third party legal proceedings against SELLER INDEMNITEE for which indemnity may be sought under this Section 9, notify BUYER thereof; provided that failure to provide such notice shall not relieve BUYER of its indemnity obligations hereunder unless and to the extent SELLER is prejudiced by such delay. Upon SELLER INDEMNITEE's request, BUYER shall assume, at its own expense, the defense of any such third-party CLAIM with reputable counsel reasonably acceptable to SELLER INDEMNITEE. SELLER shall be entitled to settle any such third-party CLAIM, with SELLER INDEMNITEE's written consent (which may be granted or withheld in SELLER INDEMNITEE's sole discretion unless there is a complete settlement which includes a full release of SELLER INDEMNITEE and no payment of money or other consideration by the SELLER INDEMNITEE, in which case SELLER INDEMNITEE's consent is not required). SELLER INDEMNITEE, at BUYER's cost, shall reasonably cooperate with BUYER in the defense of such action as BUYER may reasonably request.

**9.4. INSURANCE**

**9.4.1 GENERAL INSURANCE POLICY REQUIREMENTS**
For the PERIOD, SELLER shall maintain at its own expense the insurance coverage set forth in the Section entitled INSURANCE COVERAGE in full force and effect during the PERIOD of this AGREEMENT with underwriters reasonably acceptable to BUYER and having an A.M. Best's rating of "A VIII" or better or its equivalent rating where not available. SELLER shall provide BUYER with a copy of Certificate(s) of Insurance. All insurance policies, shall provide for a thirty (30) calendar days prior to written notice to BUYER in the event of termination, cancellation, non-renewal or a material change to the requirements as set forth in this Section entitled INSURANCE. All insurance policies shall be primary without right of contribution from any of BUYER's insurance carriers.

**9.4.2 INSURANCE COVERAGE**
Commercial General Liability including Products Completed Operations and Blanket Contractual "occurrence form" coverage with the following limits of liability.

(i) $5,000,000 per occurrence combined with single limit for Bodily Injury and Property Damages; and
(ii) Minimum $5,000,000 limit of liability per occurrence for Products-Completed Operations, Product Liability and Contractual Liability to include assumed under this AGREEMENT

**9.4.3 ADDITIONAL INSURED**
The Commercial General Liability policy shall include BUYER INDEMNITEE as additional insured in connection with the activities contemplated by the scope of this AGREEMENT to be stated explicitly on the Certificate(s) of Insurance.

**9.4.4 WAIVER OF SUBROGATION**
SELLER hereby irrevocably and unconditionally waives and shall cause its insurers to irrevocably and unconditionally waiver any rights of subrogation for claims against BUYER INDEMNITEE to be documented to BUYER's reasonable satisfaction.

**9.4.5 LIABILITY OF SELLER**
SELLER's compliance with this Section shall not relieve SELLER of any liability to BUYER INDEMNITEE arising under any other provision of this AGREEMNT except to the extent that such monies recovered are paid to BUYER INDEMNITEE to reduce SELLER's obligations to BUYER INDEMNITEE. SELLER shall be liable for any and all deductibles it may incur in connection with any of the policies listed in the Section entitled INSURANCE.

**9.5 LIMITATION OF LIABILITY**
IN NO EVENT SHALL BUYER's OR SELLER's LIABILITY, ONE TO THE OTHER, ARISING OUT OF OR RELATING TO THE RESPECTIVE OTHER PARTY'S BREACH OF ANY REPRESENTATION, WARRANTY, COVENANT OR OTHER OBLIGATION SET FORTH IN THIS AGREEMENT EXCEED USD 13 MILLION; PROVIDED HOWEVER, THAT THIS LIMITATION OF LIABILITY SHALL NOT APPLY TO CLAIMS ARISING OUT OF OR RELATING TO BAD FAITH, INTENTIONAL OR WILLFUL MISCONDUCT OF A PARTY, ITS EMPLOYEES OR OTHER REPRESENTATIVES, OR TO THIRD-PARTY CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE TO THE EXTENT CAUSED BY A BREACH OF ANY REPRESENTATION, WARRANTY, COVENANT OR OTHER OBLIGATION SET FORTH IN THIS AGREEMENT.

**10. MISCELLANEOUS PROVISIONS**

**10.1 CONFIDENTIALITY**
Prior to the EFFECTIVE DATE and during the PERIOD of this AGREEMENT, SELLER, its subcontractors and their employees may become privy, whether in writing, oral or any other form, and even if not marked as confidential, restricted, proprietary or other similar designation, with certain proprietary, technical and business information, and materials of BUYER, its parents, its affiliates and subsidiaries, including information relative to the BUYER's, its parent's, affiliates' and subsidiaries' interests in specific materials or areas of business, drawings, plans, SPECIFICATIONS, know-how, discoveries, production methods and any intended use or sale of the GOODS which is the valuable property of BUYER, its parents, its affiliates and subsidiaries by a third party on a confidential basis (collectively "CONFIDENTIAL INFORMATION"). SELLER shall neither analyze, disassemble for reverse engineering, or otherwise attempt to identify the intrinsic nature of CONFIDENTIAL INFORMATION nor use nor disclose to any third party, other than its subcontractors and shall cause its employees, subcontractors and their employees to neither analyze, disassemble for reverse engineering, or otherwise attempt to identify the intrinsic nature of CONFIDENTIAL INFORMATION nor use nor disclose to any third party, any CONFIDENTIAL INFORMATION other than for SELLER'S performance in accordance with this AGREEMENT. The commitments set forth in the preceding sentence shall not extend to any portion of CONFIDENTIAL INFORMATION , (i) which is already in SELLER's lawful possession at the time of disclosure by the BUYER, as established by relevant documentary evidence satisfactory to BUYER; (ii) which is through no act on the part of the SELLER, generally available to the public; (iii) which corresponds to that furnished by the BUYER to any third party on a non-confidential basis; or (iv) which is required to be disclosed by law or government regulation, provided that SELLER provides reasonable prior notice of such required disclosure to the BUYER. SELLER shall take any appropriate reasonable security precautions requested by BUYER including, without limitation, prohibiting visitors during production of GOODS. SELLER shall, at BUYER's option, return, or destroy all CONFIDENTIAL INFORMATION promptly upon the earlier of termination or expiration of this AGREEMENT. All CONFIDENTIAL INFORMATION shall be and remain the sole property of the BUYER, its parents, its affiliates and subsidiaries, and SELLER shall not have or obtain any rights therein. BUYER shall be entitled to specific performance and injunctive relief as remedies for any breach or threatened breach of any provision of this Section, without the necessity of posting bond or proving actual damages, which remedies shall not be deemed to be exclusive remedies for such breach or threatened breach by SELLER, but shall be in addition to all other available remedies. The rights and obligations as set forth in this provision shall survive the

termination or expiration of this AGREEMENT. The PARTIES agree that SELLER'S right to sell POWDER to OUTSIDE PARTIES as set forth herein does not violate BUYER'S rights under this Section.

**10.2 FORCE MAJEURE**
Acts of God, fires, floods, weather or other catastrophes, epidemics, or quarantine restrictions, or other cause(s) beyond the reasonable control of a PARTY, not reasonably foreseeable, not caused by acts or omissions of the PARTY affected and that could not have been avoided through a work around plan which prevent SELLER from providing or procuring the GOODS, or BUYER from receiving or using GOODS ("FOPRCE MAJEURE EVENT").. shall suspend such affected PARTY's obligation to perform hereunder during the period required to remove such FORCE MAJEURE EVENT. Such affected PARTY shall promptly notify the other PARTY of the FORCE MAJEURE EFVENT and the cause of such FORCE MAJEURE EVENT. If performance by either PARTY is suspended for any period of one hundred and twenty (120) consecutive days because of a Force Majeure Event, then either PARTY shall be entitled, at any time thereafter, while such FORCE MAJEURE EVENT continues, to terminate this AGREEMENT without any penalty, liability or further obligation therefore, immediately upon notice of such termination to the PARTY. In case of FORCE MAJEURE EVENT affecting SELLER, BUYER may purchase GOODS from other suppliers, in which case the obligation of BUYER and SELLER hereunder shall be reduced accordingly.

**10.3 ASSIGNMENT**
None of the rights, duties, or obligations under this AGREEMENT may be assigned, delegated or transferred by either PARTY without the other PARTY's written consent, which consent will not be unreasonably withheld, delayed or conditioned. SELLER will not subcontract any portion of this AGREEMENT without BUYER's written consent, which consent may not be unreasonably withheld, delayed or conditioned. Notwithstanding the preceding, BUYER may assign, without the consent of SELLER, all of its rights, duties and obligations under this AGREEMENT (i) to an affiliate of BUYER, or (ii) to a non-affiliated company in connection with the sale (including by merger or consolidation) of all or substantially all of the assets of the business to which this AGREEMENT is related. Notwithstanding the preceding, SELLER may assign, without the consent of BUYER, all of its rights, duties and obligations under this AGREEMENT in the event of the sale (including by merger or consolidation) of its manufacturing facility in Batesville, Arkansas; provided however, that if such facility is sold to a competitor of BUYER (as determined at the time of any such sale)whose primary business is in any of the following business segments: Laundry & Cleaning, Beauty Care, Health Care, Baby Care, Feminine Care, Tissue/Towel, Oral Care, or Razors and Blades. BUYER may terminate this AGREEMENT without any penalty within thirty (30) days following its receipt of notice that the AGREEMENT has been so assigned.

**10.4 CONTRACTOR STATUS**
The PARTIES are and shall remain independent contractors with respect to each other, and nothing in this AGREEMENT shall be construed to place the PARTIES in the relationship of partners, joint ventures, fiduciaries or agents. Neither PARTY is granted any right nor authority to assume nor to create an obligation nor responsibility, express or implied, on behalf of or in the name of the other nor bind the other in any manner whatsoever.

**10.5 CHANGE IN SELLER'S OWNERSHIP AND/OR CHANGE IN CONTROL**
SELLER shall notify BUYER in writing as promptly as legally possible of (i) any change of 50% or greater in ownership of SELLER; or (ii) SELLER selling, transferring or otherwise disposing all or substantially all of its assets used in any way to perform its obligations set forth in this AGREEMENT, provided SELLER's failure to provide such notification shall not be a BREACH of this AGREEMENT.

**10.6 MODIFICATION AND WAIVER**
No waiver of any provision of this AGREEMENT shall be valid or binding unless in writing and executed by the PARTY against whom enforcement is sought. No waiver by either PARTY of any breach, or the failure of either PARTY to enforce any of the terms and conditions of this AGREEMENT, shall affect, limit or waive that PARTY's right to enforce and compel compliance with all terms and conditions of this AGREMENT, or to terminate this AGREEMENT according to its terms. No modification or amendment of any provision of this AGREEMENT shall be valid or binding unless (i) executed and delivered by both PARTIES hereto in writing to the date hereof, (ii) it specifically refers to this AGREEMENT, and (iii) it specifically states that it is intended to, and shall take precedence over, this AGREEMENT. Any other modification, amendment or waiver of any provision of this AGREEMENT shall be null and VOID.

**10.7 INVALIDITY OR ILLEGALITY**
In the event any provision of this AGREEMENT is declared to be void, invalid or unlawful by any court or tribunal of component of competent jurisdiction, such provision will be deemed severed from the remainder of this AGREEMENT and the balance shall remain in full force and effect. The PARTIES shall undertake to replace the invalid, ineffective, or unenforceable provisions with valid, effective, and reinforceable provisions, which, in their commercial effect, approximate as closely as possible the intentions of the PARTIES as expressed in the invalid, ineffective, or unenforceable provisions.

**10.8 NOTICES**

All notices given hereunder shall be in writing and shall be deemed to have duly given if addressed or sent to the PARTIES at the following addresses and facsimile numbers or to such other additional address or facsimile number as any PARTY shall hereafter specify by notice to the other PARTY and the PARTIES' receipt of such notice:

SELLER:      FutureFuel Chemical Company
             2800 Gap Road
             Batesville Arkansas 72501 USA
             Attn: Omkar Bhave
             with a copy to: legal@ffcmail.com

BUYER:       Procter & Gamble Manufacturing Company
             Spring Grove Avenue
             Cincinnati, OH 45217
             Attn: Scott Miller

**10.9 HEADINGS**
Section headings hereof reference and are for convenience only and shall not affect the interpretation hereof.

**10.10 COUNTERPARTS**
The PARTIES may execute any number of counterparts to this AGREEMENT, each of which shall be an original instrument, but all of which taken together shall constitute one and the same AGREEMENT. Signed facsimile copies of this AGREEMENT shall bind the PARTIES to the same extent as original documents.

**10.11 ENTIRETY**
This AGREEMENT, which includes the recitals and the Exhibits attached hereto or incorporated by reference and made part of this AGREEMENT or subsequently incorporated into this AGREEMENT, constitutes the entire understanding and the agreement between the PARTIES regarding the subject matter of this AGREEMENT, and supersedes all prior or contemporaneous agreements, oral or written, made between the PARTIES relating to subject matter.

**10.12 AGREEMENT PRECEDENCE**
For their convenience, the PARTIES may use, from time to time, their standard purchase orders, site level execution agreements, sales releases, delivery schedules, acknowledgements, invoices and other similar preprinted forms. In the event of a conflict between this GREEMENT and any of these documents that purport to govern the same matters set forth herein, this AGREEMENT shall prevail, except as otherwise set forth in the Section entitled MODIFICATION AND WAIVER.

**10.13 GOVERNING LAW, CONSTRUCTION AND LANGAUGE**
This AGREEMENT, shall be governed by and interpreted for any and all purposes in accordance with the internal laws of Ohio applicable to contracts made and to be performed wholly within such state, without reference to principles of conflicts of laws. The courts sitting in, or having principal jurisdiction over Ohio shall have non-exclusive jurisdiction of all disputes hereunder. Each PARTY hereto irrevocably agrees that service of process upon it by certified mail-return receipt requested, addressed to it at its address set forth in the Section entitled NOTICES, shall constitute good and effective service for all purposes.

The PARTIES understand the English language and are fully aware of all terms and conditions contained herein. If any translation of this AGREEMENT is made, the English language version shall always continue to govern.

The PARTIES agree that (i) the United Nations Convention or Internal Sale of Goods shall have no force or effect on transactions under or relating to this AGREEMENT; (ii) no trade usage shall be used to explain or supplement this AGREEMENT even if either or both PARTIES were aware or should have been aware of such trade usage; and (iii) this AGREEMENT prevails over any general terms and conditions of trade.

**10.14 SURVIVAL PROVISIONS**
Neither the expiration nor termination of this AGREEMENT shall affect such of the provisions of this AGREEMENT that expressly provide that they shall operate after any such expiration or termination or which of necessity must continue to have effect after such expiration or termination, notwithstanding that the clauses themselves do not expressly provide for this.

**10.15 PUBLIC DISCLOSURES**
SELLER shall not in any way disclose the terms and conditions of this AGREEMENT without the prior written consent of BUYER (which consent may not be unreasonably withheld, delayed or conditioned) or except as required by law (and BUYER hereby acknowledges that SELLER has an obligation under the Securities Exchange Act of 1934, as amended, and other rules and regulations of the

Securities Commission to disclose this AGREEMENT as a material agreement to which SELLER is a party). For the avoidance of doubt SELLER shall neither issue press releases nor any other publications regarding the terms and conditions of this AGREEMENT, including statements as to the existence of a relationship between the PARTIES, nor use BUYERs'; its parents', its affiliates' or subsidiaries' corporate names or trademarks, without the prior written consent of BUYER (which consent may not be unreasonably withheld, delayed or conditioned) or except as required by law (and BUYER hereby acknowledges that SELLER has an obligation under the Securities Exchange Act of 1934, as amended, and other rules and regulations of the Securities and Exchange Commission to disclose this AGREEMENT as a material agreement to which SELLER is a party). Where SELLER disclosure of this AGREEMENT or parts thereof is required by law, SELLER will provide BUYER a draft copy of any disclosures to be made to meet SELLER's legal obligations, at the earliest possible time prior to making said disclosures. BUYER shall have two (2) business days from receiving such draft copy to provide SELLER with additional redaction. SELLER agrees to incorporate BUYER's additional redaction to the extent that SELLER's compliance with its legal reporting obligations is not impeded, as determined by SELLER's counsel.

**10.16 SUCCESSORS AND ASSIGNS**

All provisions of this AGREEMENT are binding upon, inure to the benefit of and are enforceable by or against the PARTIES and their respective heirs, executors, administrators or other legal representatives and permitted successors and assigns.

**10.17 THIRD-PARTY BENEFICIARY**

This AGREEMENT is solely for the benefit of the parties and their respective successors and permitted assigns, and no other person has any right, benefit, priority or interest under or because of the existence of this AGREEMENT.

**10.18 CONSTRUCTION**

Unless the context of this AGREEMENT clearly requires otherwise: (i) references to the plural include the singular and vice versa; (ii) references to any person include such person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this AGREEMENT; (iii) references to one gender include all genders; (iv) "including" is not limiting (v) "or" has the inclusive meaning represented by the phrase "and/or" (vi) the words "hereof", "herein", "hereby", "hereunder" and similar terms in this AGREEMENT refer to this AGREEMENT as a whole and not to any particular provision of this AGREEMENT; (vii) section and Exhibit references are to this AGREEMENT unless otherwise specified; and (viii) reference to any agreement (including this AGREEMENT), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

BUYER and SELLER have caused their respective duly authorized representatives to execute this AGREEMENT, acting agent(s) as set forth herein.

BUYER: The Procter & Gamble Company

By: [signature]

Printed Name: Bassem Shehata

DATE: 05/15/2018

SELLER: FutureFuel Chemical Company

By: [signature]

Printed Name:

DATE: May 18th 2018

BUYER: Procter & Gamble International Operations SA Singapore Branch

By: Soumitra Banerjee

Printed Name: Soumitra Banerjee

DATE: May 16, 2018

BUYER: Procter & Gamble Manufacturing Mexico S. de R.L. de C.V.

By: Michel Dirickx

Printed Name: Michel Dirickx

DATE: May 16, 2018

Exhibit 1

**RESTRICTED**

The Procter & Gamble Company - Technical Standard
**INDIVIDUAL RAW MATERIAL SPECIFICATION (IRMS)**
**ORIGINATOR:** Andrew Cissell

GCAS: 10090497.005
Is ATS: No
SAP Description: NONANOYLOXY BENZENE SULFONATE (NOBS) EXT

## GENERAL

Description: NONANOYLOXY BENZENE SULFONATE (NOBS) EXTRUDATES

Local Description: Extrudate of Nonanoyloxy Benzene Sulfonate (NOBS) with binders and solubilising agents.
Other Names:

Is this Standard a Template: NO
MRMS GCAS Code:
MRMS SAP Description:

| Supersedes Code | SAP Description | Supersedes On Date |
|---|---|---|
| 10090497.004 | NONANOYLOXY BENZENE SULFONATE (NOBS) EXT | |

**REASON FOR CHANGE:** Clarification of P&G quality requirements to supplier. Technical change to clarify requirements to supplier. Added assay item to ensure material free of contamination and only includes NOBS or NOBS pre-cursors. No other changes.

Is this an Intermediate Material:
Base Unit of Measure: KILOGRAM
Shelf Life:
Shipping Hazard Classification:
Shipping/Receiving/Storage Information:

**COMMENTS:**

## PERFORMANCE SPECIFICATIONS

Check associated Master Specification for additional requirements.(If Master exists.)

| Chg | Characteristic (Ch) Characteristic Specifics (CS) Common Performance Specification Code(CPS) | Test Method (GCAS) Origin (Orgn) Test Method Number(TM#) Reference Document (Ref) Test Method Specifics (Sp) | Sampling (SM) Subgroup (SG) | Start Testing | Lower Spec Limit (LSL) Lower Target (LTGT) Target (TGT) Upper Target (UTGT) Upper Spec Limit (USL) | Unit of Measure(UoM) Report to Nearest (RTN) Report Type (RT) Action (AC) | Release Criteria | Criticality (CR) Basis (BA) | Test Group (TG) Application (AP) |
|---|---|---|---|---|---|---|---|---|---|
| | Ch: Appearance<br>CS: | GCAS:<br>Orgn:<br>TM#:<br>Ref:<br>Sp: | SM: On Receipt<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: ATTRIBUTE<br>AC: CONTROL | White to off white, free flowing, cylindrically shaped particles, approximately [illegible] mm diameter x [illegible] to 2 mm long. | CR:<br>BA: | TG:<br>AP: |



Exhibit 1

**RESTRICTED**

The Procter & Gamble Company - Technical Standard

**INDIVIDUAL RAW MATERIAL SPECIFICATION (IRMS)**

GCAS: 10090497.005 SAP Description: NONANOYLOXY BENZENE SULFONATE (NOBS) EXT

| Ctg | Characteristic (Ch) Characteristic Specifics (CS) Common Performance Specification Code(CPS) | Test Method (GCAS) Origin (Orgn) Test Method Number(TMN) Reference Document (Ref) Test Method Specifics (Sp) | Sampling (SM) Subgroup (SG) | Plant Testing | Lower Spec Limit (LSL) Lower Target (LTGT) Target (TGT) Upper Target (UTGT) Upper Spec Limit (USL) | Unit of Measure(UoM) Report to Nominal (RTN) Report Type (RT) Action (AC) | Release Criteria | Criticality (CR) Basis (BA) | Test Group (TG) Application (AP) |
|---|---|---|---|---|---|---|---|---|---|
| | Ch: Odor<br>CS: | GCAS:<br>Orgn:<br>TMN:<br>Ref:<br>Sp: as is | SM: On Receipt<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: ATTRIBUTE<br>AC: CONTROL | Free from objectionable odors and typical of previous acceptable receipts. Specifically, there should be no more than a slight smell of fatty acid. | CR:<br>BA: | TG:<br>AP: |
| | Ch: Odor<br>CS: | GCAS: 61027521<br>Orgn:<br>TMN:<br>Ref:<br>Sp: in solution | SM: On Receipt<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: ATTRIBUTE<br>AC: CONTROL | [illegible] in [illegible] and water | CR:<br>BA: | TG:<br>AP: |
| | Ch: Color<br>CS: | GCAS: [illegible]<br>Orgn:<br>TMN:<br>Ref:<br>Sp: Hunter, L | SM: Every batch/ delivery<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Color<br>CS: | GCAS: [illegible]<br>Orgn:<br>TMN:<br>Ref:<br>Sp: Hunter, a | SM: Every batch/ delivery<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM:<br>RTN:<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Color<br>CS: | GCAS: [illegible]<br>Orgn:<br>TMN:<br>Ref:<br>Sp: Hunter, b | SM: Every batch/ delivery<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM:<br>RTN:<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Color<br>CS: | GCAS: [illegible]<br>Orgn:<br>TMN:<br>Ref:<br>Sp: Hunter, Delta E = square root : (Delta L)2 + (Delta a)2 + (Delta b)2 | SM: Every batch/ Delivery<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: 10.0 | UoM:<br>RTN:<br>RT: VARIABLE<br>AC: REPORT COA | | CR:<br>BA: | TG:<br>AP: |
| | Ch: [illegible]<br>CS: | GCAS:<br>Orgn:<br>TMN: [illegible]<br>Ref:<br>Sp: with [illegible] orifice | SM: Every batch/ delivery<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: 6.0 | UoM: Percentage<br>RTN: [illegible]<br>RT: VARIABLE<br>AC: REPORT COA | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Active matter<br>CS: | GCAS: [illegible]<br>Orgn:<br>TMN:<br>Ref:<br>Sp: as NOBS | SM: Every batch/ delivery<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT: [illegible]<br>UTGT:<br>USL: [illegible] | UoM: Percentage<br>RTN: [illegible]<br>RT: VARIABLE<br>AC: REPORT COA | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Density<br>CS: | GCAS:<br>Orgn:<br>TMN: [illegible]<br>Ref:<br>Sp: [illegible] | SM: See QAC<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM: Grams per liter<br>RTN: 1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |

SZH [illegible]

Exhibit 1

RESTRICTED

The Procter & Gamble Company - Technical Standard
**INDIVIDUAL RAW MATERIAL SPECIFICATION (IRMS)**

GCAS: 10090497.005 SAP Description: NONANOYLOXY BENZENE SULFONATE (NOBS) EXT

| Chg | Characteristic (Ch)<br>Characteristic Specifics (CS)<br>Common Performance Specification Data(CPS) | Test Method (GCAS)<br>Origin (Orgn)<br>Test Method Number(TM#)<br>Reference Document (Ref)<br>Test Method Specifics (Sp) | Sampling (SM)<br>Subgroup (SG) | Plant Testing | Lower Spec Limit (LSL)<br>Lower Target (LTGT)<br>Target (TGT)<br>Upper Target (UTGT)<br>Upper Spec Limit (USL) | Unit of Measure(UoM)<br>Report to Nearest (RTN)<br>Report Type (RT)<br>Action (AC) | Release Criteria | Criticality (CR)<br>Basis (BA) | Test Group (TG)<br>Application (AP) |
|---|---|---|---|---|---|---|---|---|---|
| | Ch: Grade<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A [illegible]<br>Ref:<br>Sp: [illegible] | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM:<br>RTN: 1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Solubility rate<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-5689 [illegible]<br>Ref:<br>Sp: | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: 4% | UoM: Percentage<br>RTN: 1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: pH<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-5619 [illegible]<br>Ref:<br>Sp: 1% solution in deionized water @25C | SM: See QAC<br>SG: | | LSL: 4.0<br>LTGT:<br>TGT:<br>UTGT:<br>USL: 6.5 | UoM:<br>RTN: 0.1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Insolubles<br>CS: | GCAS:<br>Orgn:<br>TM#:<br>Ref:<br>Sp: 1% solution, No visible insoluble particles by visual inspection | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: ATTRIBUTE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Fatty acid<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-5[illegible]<br>Ref:<br>Sp: [illegible] purity [illegible] Fatty Acid basis) | SM: See QAC<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT: 2.2<br>UTGT:<br>USL: 6.6 | UoM: Percentage<br>RTN: 0.1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Polyethylene Glycol (PEG) 4000<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-5619 [illegible]<br>Ref:<br>Sp: | SM: See QAC<br>SG: | | LSL: 4.0<br>LTGT:<br>TGT: 5.2<br>UTGT:<br>USL: 6.1 | UoM: Percentage<br>RTN: 0.1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Assay<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-[illegible]-203<br>Ref:<br>Sp: NaLAS [illegible] basis by [illegible] SO3 after [illegible] Hydrolysis | SM: See QAC<br>SG: | | LSL: 1.5<br>LTGT:<br>TGT: 2.5<br>UTGT:<br>USL: 3.6 | UoM: Percentage<br>RTN: 0.1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |
| | Ch: Assay<br>CS: | GCAS:<br>Orgn:<br>TM#: AERD-A-[illegible]<br>Ref:<br>Sp: Nonanoic Acid & Nonanoate as Acid, by GC Method | SM: See QAC<br>SG: | | LSL: [illegible]<br>LTGT:<br>TGT: 2.1<br>UTGT:<br>USL: 2.5 | UoM: Percentage<br>RTN: 0.1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>BA: | TG:<br>AP: |

Exhibit 1

RESTRICTED

The Procter & Gamble Company - Technical Standard

**INDIVIDUAL RAW MATERIAL SPECIFICATION (IRMS)**

GCAS: 10090497.005 SAP Description: NONANOYLOXY BENZENE SULFONATE (NOBS) EXT

| Chg | Characteristic (Ch) Characteristic Specifics (CS) Common Performance Specification Code (CPS) | Test Method (GCAS) Origin (Orgn) Test Method Number (TMN) Reference Document (Ref) Test Method Specifics (Sp) | Sampling (SM) Subgroup (SG) | Peri. Testing | Lower Spec Limit (LSL) Lower Target (LTGT) Target (TGT) Upper Target (UTGT) Upper Spec Limit (USL) | Unit of Measure (UoM) Report to Nearest (RTN) Report Type (RT) Action (AC) | Release Criteria | Criticality (CR) Data (DA) | Test Group (TG) Application (AP) |
|---|---|---|---|---|---|---|---|---|---|
| | Ch: Assay<br>CS: | GCAS:<br>Orgn:<br>TMN:<br>Ref:<br>Sp: NOBS or NOBS pre-cursors | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: | UoM:<br>RTN:<br>RT: ATTRIBUTE<br>AC: CONTROL | Free of contamination and typical of previous receipts. Material should only contain NOBS or NOBS pre-cursors as defined in specification. | CR:<br>DA: | TG:<br>AP: |
| | Ch: Iron<br>CS: | GCAS:<br>Orgn:<br>TMN: ARSO A-[illegible]<br>Ref:<br>Sp: Colorimetric | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM: Parts per million<br>RTN: 1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>DA: | TG:<br>AP: |
| | Ch: Particle size<br>CS: | GCAS:<br>Orgn:<br>TMN: ARSO A [illegible]<br>Ref:<br>Sp: (Sieves, 10 minutes, Rotap, 50 g sample) On 1.68mm (Tyler 12 or equivalent) | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: 5 | UoM: Percentage<br>RTN: 1<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>DA: | TG:<br>AP: |
| | Ch: Particle size<br>CS: | GCAS:<br>Orgn:<br>TMN: ARSO-A-5655-DTM-29<br>Ref:<br>Sp: (Sieves, 10 minutes, Rotap, 50 g sample) Thru [illegible] (Tyler [illegible] or equivalent) | SM: See QAC<br>SG: | | LSL:<br>LTGT:<br>TGT:<br>UTGT:<br>USL: [illegible] | UoM: Percentage<br>RTN: 0.01<br>RT: VARIABLE<br>AC: CONTROL | | CR:<br>DA: | TG:<br>AP: |

**REFERENCES**

| GCAS Code | SAP Description | Type |
|---|---|---|
| 95100719 | IV-1 DLSO Raw Mat Sampling & Analytical | PROS |
| 95491697 | supplier boilerplate information | QAC |
| 95240792 | Dry Laundry Sampling Instructions - LA | RMPI |
| 95100700 | IV-85 DLSO RMPI- 10090497 NOBS | RMPI |

| Approved Supplier List | |
|---|---|
| GCAS Code | SAP Description |
| 95649755 | ASL for 10090497, Nonanoyloxy Benzene Su |

& 2 # KS

Exhibit 1

# PROCTER & GAMBLE FABRIC & HOME CARE

| Supersedes: Issue 1<br>Date: 4 May 2006 | General & Quality Assurance Information | Issue: 2<br>Page: 1 of 1 |
|---|---|---|

## TO BE READ IN CONJUNCTION WITH STRUCTURED RAW MATERIAL SPECIFICATIONS

1. GENERAL:

Human and Environmental Safety Considerations, Regulated Products Statements & other considerations of supply:
It is Procter & Gamble's intent and responsibility to provide its customers with products which perform as expected, and which are safe for humans and are also safe in the environment. To assure that these obligations are properly discharged, there are certain procedures with regard to raw materials which must be followed. These procedures are to permit Procter & Gamble Current Business Support, prior to shipment, to make a determination whether any process modifications or questionable material quality will have any negative effect on Procter & Gamble processes, finished products, the human and environmental safety of products, as well as to add to our health safety information:

- The Supplier shall notify P&G prior to making any significant changes to the material defined in this RMS. 'Significant' changes mean changes in the production process, raw materials, feed stocks, or equipment having affect to the product specification, or otherwise affecting the material so supplied, as described in the 'Chemical Description' in this specification, as well as changes in the production location(s) or packaging involved, and shall obtain P&G's agreement that such changes do not render the material supplied hereunder unsuitable for P&G's use prior to instituting such changes. Such agreement from P&G will not be unreasonably withheld.

- The Supplier acknowledges that P&G will, from time to time, require access to results of studies and tests conducted by the Supplier, or for the Supplier, concerning human and environmental safety of products supplied to P&G by the Supplier. The Supplier is prepared to provide access to P&G to such results of studies and tests upon request of P&G, provided that P&G specifies the purpose for which P&G requires such results and uses such information strictly for the purpose specified. The form (e.g. letter of results or disclosure of results), the extent (e.g. only summary of results or study itself) and the conditions (e.g. secrecy agreement, license fee) upon which such access will be provided to P&G will be determined upon a case-by-case basis. The Supplier will not be required to provide P&G with proprietary information developed by or for third parties.

- Material Safety Data Sheets: It is the supplier's responsibility to notify the Procter and Gamble Company of information pertinent to the industrial health and safety aspects of the chemical.
The supplier shall provide a current MSDS to each destination to which the chemical has been shipped. Suppliers shall provide updated MSDS sheets as they become available, to each shipment destination.
Directing Attention to Significant Changes: Suppliers of chemicals and raw materials shall specifically notify P&G of significant changes in Material Safety Data Sheets(MSDS). The identification of changes to MSDS shall be effected by the provision by the Supplier to P&G of an updated MSDS as they become available to each shipment destination that received the material within the preceding twelve months. The changes will be highlighted (e.g. by vertical lines at the margin of the sheet) to draw attention to the significant changes relative to prior versions of the MSDS.
Significant Changes: A change in MSDS information which results in the establishment of a revised exposure limit for an existing route of exposure, in the establishment of a new exposure limit for an additional route of exposure, or a change in the DOT shipping/environmental hazard classification is considered to be significant. Additionally, any change in the MSDS resulting from new test data, from regulatory agency direction, or from a change in the specified personal protective equipment will be considered significant.
Mailing Address: In addition to distribution of MSD Sheets to the locations to which materials have been shipped, one additional copy shall be sent to: Global FAHC R&D HS&E Leader, P&G, FAHCIC, 5299 Spring Grove Avenue, Box 355, Cincinnati, Ohio 45217

Identification of Shipping Papers with Raw Material Specification Number
To aid in identification and preventing misuse of raw materials, the suppliers are required to include the 'RMS No.' on each shipper's invoice, and shipper's analysis report.

2. QUALITY ASSURANCE:

(i) Suppliers are required to provide data via a Certificate of Analysis.
(ii) Certificate of Analysis (COA)
In order to provide reassurance on quality, suppliers are required to provide each P&G receiving plant with a COA which covers those items listed below, along with or ahead of each delivery.
The COA/shipping documents should contain the following information, items marked ❖ are mandatory on the COA, omission may result in P&G receiving sites rejecting deliveries:

| Supplier Information | Product information | Analytical Results |
|---|---|---|
| ➢ Name & Address of Supplier<br>➢ Name & Address of Manufacturer (if different to Supplier)<br>➢ Contact Name, Position & Telephone/FAX No. to be used in case of questions. | ❖ P&G RMS No.<br>➢ P&G Order No.<br>❖ Supplier's product Trade Name or chemical name<br>❖ Supplier's Batch/Lot No. or other unique identification.<br>➢ For bulk deliveries (optional) - Tank car identity (Name of Ship or Vessel & Date loaded. | ❖ Target value/limits/units as specified in this RMS<br>❖ Analysed Result in the same units |

| Action Required | Old Designation | Description | Frequency of reporting |
|---|---|---|---|
| REPORT COA | CERTIFIABLE | Items to be included on all certificates of analysis, with or before every delivery | Every Batch/Delivery as agreed |
| CONTROL | CHARACTERISTICS | Not required on certificate of analysis to be checked on receipt. | |
| | NON-CERTIFIABLE | Items to be confirmed as a condition of technical approval & thereafter measured at an agreed frequency. Results to be reported to P&G if requested &/or if results are obtained which are outside the specified limit(s) | At an agreed frequency |
| REFERENCE | NON-REPORTABLE | Reference items which must comply but are not required to be reported | Never |

Unless otherwise stated in the RMS, the specification targets &/or limits are based on single results (i.e. no averaging) and must be reported as such.

Where it is necessary to use composited samples to ensure representative results, the sampling plan must be agreed with P&G and the specification limits will reflect this.

When average results are reported, release criteria will be based on statistical analysis and quoted on the RMS & COA.

Suppliers must not use a method other than that defined on this RMS without agreement from the P&G Material & Process Optimisation group. Agreement will be based on the supplier being able to demonstrate equivalence, this agreement will be documented in the supplier agreement letter.

In the event of differences between Supplier and P&G data, the decision to accept or reject will be based on the reference method shown on this RMS.

| Originator: Ian Addy | Location: NTC |
|---|---|

Case: 1:20-cv-00183-MWM Doc #: 1-1 Filed: 03/03/20 Page: 19 of 26 PAGEID #: 31

**Hess, Gary**

**From:** Deshpande, Vilas [deshpande.vn@pg.com]
**Sent:** Wednesday, April 30, 2008 7:30 PM
**To:** Hess, Gary
**Subject:** FW: NOBS SAMPLING (2)

Gary,

Good news, here is the concurrence from Rick re. the NOBS sampling plan you shared earlier this month.

We are good to proceed with signing the contract however if you give me a few more days, I would like to (finally) get the names of the P&G signatories added to the contract text, so they have to just sign and date.

Let me know if this will work for you. I will be connecting to e-mail periodically over the first week that I am out so we can still keep in touch until you send your signed contract copies to Nelson's attention.

Regards,
... Vilas

---

**From:** Rust, Rick
**Sent:** Wednesday, April 30, 2008 10:07 AM
**To:** Deshpande, Vilas
**Subject:** RE: NOBS SAMPLING (2)

Vilas,
On the general RMS standard, we use the following clause.

Where it is necessary to use composited samples to ensure representative results, the sampling plan must be agreed with P&G and the specification limits will reflect this.

For a material such as NOBS, composite sampling is required to obtain representative results.
I concur with the testing protocol as used by Future Fuels.

Rick Rust 513-698-6490

---

**From:** Deshpande, Vilas
**Sent:** Wednesday, April 16, 2008 4:09 PM
**To:** Rust, Rick
**Cc:** Grosse, Bob; Teixeira, Ted
**Subject:** FW: NOBS SAMPLING (2)

Rick,

Can you please review the attached NOBS sampling procedure historically used by FutureFuel/Eastman and let

**Hess, Gary**

---

**From:** Deshpande, Vilas [deshpande.vn@pg.com]
**Sent:** Wednesday, April 30, 2008 7:30 PM
**To:** Hess, Gary
**Subject:** FW: NOBS SAMPLING (2)

Gary,

Good news, here is the concurrence from Rick re. the NOBS sampling plan you shared earlier this month.

We are good to proceed with signing the contract however if you give me a few more days, I would like to (finally) get the names of the P&G signatories added to the contract text, so they have to just sign and date.

Let me know if this will work for you. I will be connecting to e-mail periodically over the first week that I am out so we can still keep in touch until you send your signed contract copies to Nelson's attention.

Regards,
... Vilas

---

**From:** Rust, Rick
**Sent:** Wednesday, April 30, 2008 10:07 AM
**To:** Deshpande, Vilas
**Subject:** RE: NOBS SAMPLING (2)

Vilas,
On the general RMS standard, we use the following clause.

Where it is necessary to use composited samples to ensure representative results, the sampling plan must be agreed with P&G and the specification limits will reflect this.

For a material such as NOBS, composite sampling is required to obtain representative results.
I concur with the testing protocol as used by Future Fuels.

**Rick Rust** 513-698-6490

---

**From:** Deshpande, Vilas
**Sent:** Wednesday, April 16, 2008 4:09 PM
**To:** Rust, Rick
**Cc:** Grosse, Bob; Teixeira, Ted
**Subject:** FW: NOBS SAMPLING (2)

Rick,

Can you please review the attached NOBS sampling procedure historically used by FutureFuel/Eastman and let

me know if this meets the intent of the directions we provide in the RMS boilerplate which is now part of the new commercial contract?

Regards,

... Vilas

---

**From:** Hess, Gary [mailto:GaryHess@ffcmail.com]
**Sent:** Wednesday, April 16, 2008 3:34 PM
**To:** Deshpande, Vilas
**Subject:** NOBS SAMPLING (2)

<<NOBS SAMPLING (2).doc>>

Vilas, this is the sampling procedure that we have been using since 2003. Carolyn Defries our QC manager and Brent are confident that we have discussed this with P&G but we cannot find a confirmative acceptance or letter of agreement from you. The good news is that the process has worked well and we are confident based on years of history that it accurately reflects the quality of product which we ship. As long as you are okay with this the RMS stipulates that we can sample in another fashion as long as we have agreement with you. As we discussed, I did not want to sign something that was not reflective of what we are doing. Please let me know, if you need anything additional from me and how you want to proceed. I believe that this is the last loose end for the contract. I am in Batesville this week at 870-698-5477. Take care.

Gary

**This message, including attachments, is from FutureFuel Chemical Company. This message contains information that may be confidential and/or contain proprietary information. If you are not the intended recipient, promptly delete this message and notify the sender of the delivery error by return e mail or call us at 870-698-3000. You may not forward, print, copy, distribute, or use the information in this message if you are not the intended recipient.

# Exhibit 2

## DESCRIPTION OF NOBS QUARTERLY PRICE CALCULATION

| Section | Item | Description |
|---|---|---|
| Raw Material | Usage Factor † | Average raw material usage factors from January 1, 2005 through October, 2007. For reference, the volume offtake during this period was ~30 million pounds per year on 100% active basis. |
| | Average Price | For all starting materials except Nonanoic Acid, FFCC's Average Purchase Price in $/lb. Delivered to Magness for 3-month period. For Q1, average purchase price for September through November. For Q2, December through February. For Q3, March through May. For Q4, June through August. For Nonanoic Acid, forecasted price in $/lb. Delivered to Magness, provided by P&G for the same quarter (no lag). |
| | $ Impact | Usage Factor * Average Price |
| Labor | Beginning Value † | BLS Labor Index value for October 2007; 19.36(p). |
| | Multiplier † | Labor component of Ex-works Price per lb. 100% Active Basis |
| | Index Value | BLS Labor Index (ceu3232500008). For Q1, October. For Q2, January. For Q3, April. For Q4, July. Use reported value as-is, i.e., ignore (p) designation. |
| | $ Impact | (1 + ((Index Value - Beginning Value) / Beginning Value)) * Multiplier |
| Energy | Beginning Value † | BLS Energy Index value for November 2007; 130.9(p). |
| | Multiplier † | Energy component of Ex-works Price per lb. 100% Active Basis |
| | Index Value | BLS Energy Index (wpu0512). For Q1, November. For Q2, February. For Q3, May. For Q4, August. Use reported value as-is, i.e., ignore (p) designation. |
| | $ Impact | (1 + ((Index Value - Beginning Value) / Beginning Value)) * Multiplier |
| Conversion | Projected Volume | Projected 100% Active Volume for quarter in million lbs per quarter. Volume forecast supplied by P&G. |
| | $ Impact | The value is obtained from the NOBS Price Curve table and is based on the projected quarter volume multiplied by 4. |
| Ex-Works Price Per LB, 100% Active Basis | | $ Impact Raw Materials + $ Impact Labor + $ Impact Energy + $ Impact Conversion |
| | Supersacking Fee † | $0.132/kg for 81% active stock shipments. Supersacking Fee of $0.132/kg was the average fee per quarter in 2007. |
| | Drumming Fee † | $0.44/kg for 81% active stock shipments |
| Ex-Works Price Per KG, Converted to 81% Active Stock Shipments | Railcar | (Ex-Works Price Per LB, 100% Active Basis) * 2.20462 * 0.81 |
| | Supersack | ((Ex-Works Price Per LB, 100% Active Basis) * 2.20462 * 0.81) – $0.132/kg Supersacking Fee. |
| | Drum | ((Ex-Works Price Per LB, 100% Active Basis) * 2.20462 * 0.81) – $0.44/kg Drumming Fee |

All items marked by † above are fixed for the TERM of the AGREEMENT, remaining items are variable as described above.

## DESCRIPTION OF NOBS QUARTERLY VOLUME RECONCILIATION

| Item | Description |
|---|---|
| Projected Volume | Projected 100% Active Volume for quarter in million lbs per quarter. Volume forecast supplied by P&G. |
| Conversion $ Impact | The value is obtained from the NOBS Price Curve table and is based on the Projected Volume multiplied by 4. |
| Actual Volume | Actual 100% Active Volume for quarter in million lbs. Supplied by FFCC CSR in the NOBS Quarterly Shipment Summary. |
| Recalculated $ Impact | The value is obtained from the NOBS Price Curve table and is based on the Actual Volume multiplied by 4. |
| Difference | Recalculated $ Impact - Conversion $ Impact |
| Reconciliation Value | Difference * Actual Volume * 1,000,000. An appropriate Debit or Credit Memo will be issued to P&G. If Debit Memo, the P&G supplied PO number will be referenced. |

## Exhibit 2

### Description of NOBS Quarterly Price Calculation

| Section | Item | Description |
|---|---|---|
| Raw Material | Usage Factor † | Average raw material usage factors from January 1 2005 through October, 2007. For reference, the volume off-take during this period was ~30 million pounds per year on 100% active basis. |
| | Average Price | For all starting materials except Nonanoic Acid, FFCC's Average Purchase Price in $/lb, Delivered to Magness for 3-month period. For Q1, average purchase price for September through November. For Q2, December through February. For Q3, March through May. For Q4, June through August. For Nonanoic Acid, forecasted price in $/lb, Delivered to Magness, provided by P&G for the same quarter (no lag). |
| | $ Impact | Usage Factor * Average Price |
| Labor | Beginning Value † | BLS Labor Index value for October 2007; 19.36(p). |
| | Multiplier † | Labor component of Ex-works Price per lb, 100$ Active Basis |
| | Index Value | BLS Labor Index (ceu3232500008). For Q1, October. For Q2, January. For Q3, April, for Q4, July. Use reported value as-is, i.e. ignore (p) designation. |
| | $ Impact | (1 + ((Index Value – Beginning Value)/Beginning Value)) * Multiplier |
| Energy | Beginning Value † | BLS Energy Index value for November 2007; 130.9 (p) |
| | Multiplier † | Energy component of Ex-works Price per lb, 100% Active Basis |
| | Index Value | BLS Energy Index (wpu0512). For Q1, November. For Q2, February. For Q3, May. For Q4, August. Use reported value as-is, i.e. ignore (p) designation. |
| | $ Impact | (1 + ((Index Value – Beginning Value)/Beginning Value)) * Multiplier |
| Conversion | Projected Volume | Projected 100% Active Volume for quarter in million lbs per quarter. Volume forecast supplied by P&G. |
| | $ Impact | The value is obtained from the NOBS Price Curve table and is based on the projected quarter volume multiplied by 4. |
| Ex-Works Price Per LB, 100% Active Basis | | $ Impact Raw Materials + $ Impact Labor + $ Impact Energy + $ Impact Conversion |
| | Bulk Bag Fee † | $0.132/KG for 81% active stock shipments. Bulk bag fee of $0.132/KG was the average fee per quarter in 2007. |
| | Drumming Fee † | $0.44/KG for 81% active stock shipments |
| Ex-Works Price Per KG, Converted to 81% Active Stock Shipments | Railcar | (Ex-Works Price per LB, 100% Active basis) * 2.20462 *0.81 |
| | Bulk Bag | ((Ex-Works Price per LB, 100% Active basis) * 2.20462 *0.81) + 0.132/KG Bulk Bag Fee |
| | Drum | ((Ex-Works Price per LB, 100% Active basis) * 2.20462 *0.81) + $0.44/KG Drumming Fee |

All items marked by † above are fixed for the PERIOD of the AGREEMENT, remaining items are variable as described above.

# EXHIBIT 2A

## NOBS QUARTERLY PRICE CALCULATION

## NOBS VOLUME ADJUSTMENT

| NOBS QUARTERLY PRICE CALCULATION | | | New agreement Base Price, May 2015 Raws | | New Agreement for Q4 | |
|---|---|---|---|---|---|---|
| | | | Q1 2017 | | Q4 2017 | |
| **RAW MATERIALS** | | | | | | |
| | **Usage Factor** | **Update Phenol & TXIB Usage Factor*** | **Average Price** | **$ Impact** | **Average Price** | **$ Impact** |
| **Nonanoic (C9) Acid** | 0.550 | | $1.2600 | $0.693 | $1.3024 | $0.716 |
| **Phenol** | 0.376 | **0.417** | $0.4500 | $0.188 | $0.4329 | $0.181 |
| **PEG 4000** | 0.068 | | $1.6165 | $0.110 | $1.1553 | $0.078 |
| **Palmitic Acid** | 0.072 | | $0.5908 | $0.043 | $0.7192 | $0.052 |
| **90% SDDS (LAS)** | 0.040 | | $1.5994 | $0.064 | $1.5658 | $0.063 |
| **Acetic Anhydride** | 0.458 | | $1.0000 | $0.458 | $0.9861 | $0.452 |
| **TXIB** | 0.025 | **0.000** | $1.1235 | $0.000 | $1.1235 | $0.000 |
| **Caustic Soda, 50%** | 0.101 | | $0.1033 | $0.010 | $0.1040 | $0.011 |
| **Oleum** | 0.417 | | $0.0827 | $0.035 | $0.0835 | $0.035 |
| **Total Raw Materials** | | | | $1.600 | | $1.587 |
| **CONVERSION** | | | | | | |
| | | | **Projected Volume** | **$ Impact** | **Projected Volume** | **$ Impact** |
| | | | 4.000 | $1.200 | 4.000 | $1.200 |
| **EX-WORKS PRICE PER LB, 100% ACTIVE BASIS** | | | | | | |
| | | | | **Price per lb** | | **Price per lb** |
| | | | | $2.800 | | $2.787 |
| **EX-WORKS PRICE PER KG, CONVERTED TO 81% ACTIVE STOCK SHIPMENTS** | | | | | | |
| | | | | **Price per kg** | | **Price per kg** |
| **Railcar** | | | | $5.000 | | $4.977 |
| **Supersacks (includes supersacking fee of $0.132 per kg)** | | | | $5.132 | | $5.109 |
| **194 kg bags (includes sacking fee of $0.40 per kg)** | | | | $5.400 | | $5.377 |
| **Drums (includes drumming fee of $0.44 per kg)** | | | | $5.440 | | $5.417 |

# EXHIBIT 3

## Nonanoic Acid Specification
## (Pelargonic Acid)

| | |
|---|---|
| Total Acid, as Nonanoic, Wt. % | 98.5 min |
| 2-Methyloctanoic Acid, Wt. % | 3.5 max |
| Water, Wt. % | 0.1 max |
| Color, Pt-Co Units | 25 max |
| Carbonyls, as MW 142, Wt. % | 0.3 max |
| Iodine Value, Wt. % | 0.6 max |
| Iron, ppm | 0.25 max |

**EXHIBIT 4**

PRICE RECONCILIATION PROCEDURE

1. The PRICE of GOODS will be determined via a quarterly teleconference or personal meeting between BUYER and SELLER, at least two (2) working days prior to end of the current calendar quarter, or otherwise as agreed by the PARTIES.
2. Since the PRICE calculated ahead of each calendar quarter is dependent on BUYER's forecasted volume, BUYER and SELLER shall re-calculate the PRICE at the end of the said quarter based on actual quantity of GOODS (on 100% active basis) shipped to BUYER.
3. BUYER and SELLER will calculate the credit or debit transaction needed between the PARTIES to settle the difference between invoice payments for said quarter made on the basis of the forecasted PRICE and the PRICE based on actual quantity shipped as defined in Exhibit 2, Pages 1 and 4.
4. BUYER and SELLER agree that any errors found to have been made for any PRICE calculations during the TERM of this AGREEMENT will be resolved as promptly as possible.